## S08A1076. WHATLEY v. TERRY.

(668 SE2d 651)

SEARS, Chief Justice.

A jury found Frederick R. Whatley guilty of the murder of Ed Allen and related offenses and sentenced him to death. This Court affirmed Whatley's convictions and sentences in 1998.[1] Whatley filed a petition for writ of habeas corpus on August 6, 1999, which he amended on April 30, 2001. An evidentiary hearing was held on July 30, 2002, and, after a new judge was assigned to the case, closing arguments were heard on December 8, 2005. The habeas court denied Whatley's petition in an order filed on December 4, 2006, and this Court granted Whatley's application for certificate of probable cause to appeal. For the reasons set forth below, we affirm the habeas court's denial of Whatley's habeas petition.

### I. Factual Background

The evidence at trial supports the following description of the murder. At 8:45 p.m. on January 26, 1995, Whatley entered Roy's

---

[1] *Whatley v. State*, 270 Ga. 296 (509 SE2d 45) (1998).

Bait Shop in Griffin armed with a .32 caliber revolver he had stolen from a relative. The only persons inside the store at the time were the owner, Ed Allen, and an employee named Tommy Bunn. Whatley forced Bunn to lie on the floor behind the service counter and held the .32 caliber revolver to Bunn's head, and he threatened to shoot Bunn if Allen did not comply with his demand for the money from the cash register. Allen placed the money in a paper sack, and Whatley took it. Whatley backed around to the front of the counter and fired two shots, one shot striking Allen in the chest from a range of fifteen to eighteen inches and a second shot striking the counter that Bunn was lying behind from a range of eight inches. Allen pursued Whatley and fired his .44 caliber single-action pistol at him. Whatley left the store and encountered Ray Coursey, who had just arrived at the store in an automobile. Whatley held the revolver to Coursey and demanded a ride. Allen came out of the store and continued firing his pistol at Whatley. Whatley exited Coursey's automobile on the side opposite from Allen's position, and he fled on foot. At some point, Whatley was shot in the right knee. After Whatley ran away, Allen returned to the store, told Bunn to call 911, lay down on the floor, and died of internal bleeding.

## II. Alleged Suppression of Evidence by the State

### A. Background of the Claim

Whatley forced Bunn at gunpoint to lie on the floor next to the cash register during the robbery, and Bunn remained there until all of the shooting had stopped. The theory presented to the jury by the State at trial was that, as Whatley began backing away from the service counter, he fired twice, once at Allen at close range and once downward toward Bunn. Bunn's testimony under direct examination in the guilt/innocence phase was consistent with this theory, as he maintained that he had heard two shots fired before Allen stepped over him to pursue Whatley. Trial counsel then cross-examined Bunn by specifically referring to a statement Bunn made to police on the night of the murder, January 26, 1995. The written investigative summary counsel was referring to in his cross-examination reports that Bunn stated as follows on January 26:

> [Whatley] moved off of me and backed around the counter, when he went around the counter and Ed come around over top of me going after him. I don't know where he was. I was still laying on the floor when I heard the shot.

Counsel did not read this statement aloud at trial but, instead, simply had the witness himself acknowledge that he did not tell the

police in his January 26 interview that shots were fired *before* Allen stepped over him. Counsel specifically stated that it was the January 26 interview that he was relying on in forming his questions to Bunn. Bunn explained his account in his January 26 interview regarding the timing of the shots by stating that he was "upset" during that interview. Counsel, by pointing out to Bunn that Allen had not bled on him, was also able to get Bunn to admit on cross-examination that he did not know when Allen was shot. Whatley testified in the sentencing phase to a version of events different from Bunn's: Whatley claimed that he never intended to shoot anyone and that he fired at Allen only *after* Allen pulled out his gun.

At the habeas hearing, Whatley presented an audio recording[2] of an interview of Bunn that was conducted the day after the murder, January 27. Whatley obtained the recording through an Open Records Act request to the Griffin Police Department, which request was legally available only *after* Whatley's criminal case was concluded.[3] Like the January 26 statement used by counsel at trial, part of the January 27 interview at least arguably suggests that Allen stepped over Bunn to pursue Whatley *before* any shots were fired. Bunn stated as follows in the January 27 interview:

> [Whatley] done got the money and all, you know. I figured he's going on out, and that's when I see Ed go over me, and he went out, and that's when the shooting and all starts.

However, earlier in this January 27 interview, Bunn gave a different chronology, stating as follows:

> Then [Whatley] got off me, and backed around the corner, you know. I guess he was going on back toward the door. I heard something start shooting. Then I seen Ed come across me, on around the corner, too. Next thing I know I just kept hearing, ya know, gun shots.

Thus, at the most, the January 27 interview contains two contradictory chronologies, one placing the shooting before Allen stepped over Bunn to pursue Whatley and one placing the shooting after. Furthermore, in between these two arguably contradictory chronologies in the January 27 interview, Bunn expressed uncertainty when asked

---

[2] An unofficial transcript of the recording is also in the record, but our quotations from the recording are drawn from our review of the recording itself. We note, however, that there are no differences between the unofficial transcripts and the original evidence that affect our decision.

[3] See OCGA § 50-18-72 (a) (4); *Parker v. Lee*, 259 Ga. 195, 197-198 (4) (378 SE2d 677) (1989).

specifically whether the shots began before or after Allen stepped over him and went around the corner of the counter. Bunn was then further asked, "Who started shooting?" He responded as follows: "I guess [Whatley]. But, you know, I don't know." He then provided the following explanation for his uncertainty: "[I]t happened so quick, and I'm all shook up, too."

Whatley argues that his cross-examination of Bunn would have been enhanced if counsel had been provided the January 27 interview, particularly because counsel could have emphasized that, although Bunn might have been confused because he was "upset" on January 26, he would have calmed down by January 27 and would have given a more accurate account of the crime. Whatley argues that the portion of the January 27 interview in which Bunn arguably indicated that Allen began to pursue Whatley before any shots were fired could have been used to show that Whatley did not enter the store with the intent to commit murder, which the jury might have found mitigating in the sentencing phase.

### B. Procedural Default

The habeas court correctly found that this claim, at least as an initial matter, is barred by procedural default because it was not raised in the trial court or on direct appeal.[4] However, the bar to procedurally defaulted claims can be overcome by satisfying the cause and prejudice test.[5] Because the habeas court applied the cause and prejudice test in a manner we found questionable, we directed the parties to address that issue on appeal.

### 1. Alleged Cause for Failure to Raise the Claim Previously

The cause portion of the cause and prejudice test is satisfied where evidence was "concealed from [the defendant] by the State" at the time of trial and direct appeal.[6] Thus, the cause prong of the cause and prejudice test would be satisfied in Whatley's case if the facts showed that trial counsel was not given notice of and access to the contents of the January 27 statement. Without any detailed analysis, the habeas court found that Whatley had failed to show cause for his failure to raise this claim in the trial court and on direct

---

[4] *Head v. Ferrell*, 274 Ga. 399, 401-402 (III) (554 SE2d 155) (2001); OCGA § 9-14-48 (d). See also *Waldrip v. Head*, 279 Ga. 826, 832-833 (II) (H) (620 SE2d 829) (2005) (applying procedural default and the cause and prejudice test to an evidence suppression claim).

[5] *Ferrell*, 274 Ga. at 401-402 (III) (describing the cause and prejudice test and noting that relief is also available despite procedural default under circumstances, not alleged to be present in Whatley's case, amounting to a miscarriage of justice).

[6] *Schofield v. Palmer*, 279 Ga. 848, 851 (2) (621 SE2d 726) (2005).

appeal, concluding that the claim "was available for presentation" at that time.

We find that the habeas court's finding of an absence of cause to excuse the procedural default was erroneous. In its analysis of the prejudice prong of the cause and prejudice test, which is discussed below, the habeas court found that "a review of trial counsel's cross-examination questions and Mr. Bunn's responses to these questions showed trial counsel's awareness of" the January 27 interview. A review of the trial transcript does not support this finding of fact. Trial counsel's cross-examination questions about Tommy Bunn's having failed to inform police that shots were fired before Allen began to pursue Whatley could have been derived from the January 26 interview, the January 27 interview, or both. However, trial counsel specifically stated in his cross-examination that he was relying on the January 26 interview. Although not discussed in the habeas court's order, the district attorney conceded in his habeas testimony that *he* had not been provided the January 27 interview by the police department and, therefore, that trial counsel would not have had access to it. Trial counsel, having passed away, was not available to give habeas testimony on the subject; however, the January 27 interview was not contained in trial counsel's file, and the defense investigator testified that *he* had not been aware that the interview existed. In light of the trial transcript and the uncontradicted habeas testimony, including an admission by the district attorney, we find that the habeas court's finding of fact that the January 27 interview was available to counsel at trial and on direct appeal was clearly erroneous.

The State's duty to disclose exculpatory evidence applies to every part of the State that is involved in the prosecution, which, of course, would include the police department in Whatley's case.[7] Given the fact that the State bore this duty of disclosure and given the absence of any reason to believe trial counsel should have been aware of the likelihood of a second, arguably contradictory interview of Bunn, the failure of trial counsel to discover the undisclosed interview should not be ascribed to a lack of reasonable diligence.[8] Accordingly, we conclude that Whatley has shown cause for his failure to raise his claim regarding the undisclosed January 27 interview at trial and on direct appeal.

---

[7] Id. at 852 (2).

[8] See *Turpin v. Todd*, 268 Ga. 820, 824-827 (2) (a) (493 SE2d 900) (1997) (finding cause to excuse a procedural default where the State breached a "constitutional duty" to disclose the information forming the basis of the claim).

## 2. *Alleged Prejudice from Inability to Raise the Claim Previously*

Although Whatley has shown cause to excuse the procedural default to this evidence suppression claim, he must also satisfy the prejudice prong of the cause and prejudice test before his claim can be considered on its merits. However, because the prejudice necessary to satisfy the cause and prejudice test is a prejudice of constitutional proportions and because an evidence suppression claim is a constitutional claim, the prejudice analysis and the analysis of the merits of the evidence suppression claim "are co-extensive."[9]

As was noted above, the habeas court found that trial counsel's cross-examination of Tommy Bunn "showed trial counsel's awareness of the statements Mr. Bunn made during this interview that was allegedly suppressed." However, we have concluded that this finding was clearly erroneous. Thus, the habeas court's resolution of the prejudice question rests on an erroneous finding of fact.

The habeas court's error does not necessarily mean, however, that Whatley can demonstrate prejudice. Even though the facts show without contradiction that Whatley was not provided the January 27 interview before trial and direct appeal, we must consider whether his not having the interview created prejudice of constitutional proportions. To show that, Whatley must demonstrate that he can prevail on his underlying evidence suppression claim, which requires a showing of each of the following:

> (1) the State possessed evidence favorable to the defendant; (2) the defendant did not possess the favorable evidence and could not obtain it himself with any reasonable diligence; (3) the State suppressed the favorable evidence; and (4) had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the trial would have been different.[10]

We conclude that Whatley has failed to satisfy the fourth element, a showing that having the January 27 interview at trial would have created a reasonable probability of a different outcome. As we noted above, the January 27 interview arguably contains contradictory statements by Tommy Bunn regarding whether the first shots were fired before or after Ed Allen began to pursue Whatley, as well as statements expressing uncertainty regarding the timing of those shots. However, Bunn himself ultimately testified under cross-examination *at trial* that he could not recall whether the shots came

---

[9] *Waldrip*, 279 Ga. at 832 (II) (H).

[10] *Palmer*, 279 Ga. at 852 (2) (applying *Brady v. Maryland*, 373 U. S. 83 (83 SC 1194, 10 LE2d 215) (1963)).

first or whether Allen's stepping over him to pursue Whatley came first. Thus, the jury, either with or without being presented with the full January 27 interview, would have concluded that Bunn could not be relied upon to establish a detailed chronology. Furthermore, the district attorney persuasively argued that Whatley must have fired at Allen before Allen was armed, because Allen was shot in the chest at a range of 15 to 18 inches and because it otherwise would have been unlikely for Whatley to have shot Allen in the chest from such a close distance without being shot himself by Allen somewhere other than just in the leg. Furthermore, Whatley's account of events cannot be reasonably reconciled with the testimony at trial indicating that he fired a shot toward either Allen or Bunn from a distance of merely eight inches from the service counter. We conclude as a matter of law that there would not have been a reasonable probability of a different outcome at trial if Whatley had been provided the January 27 interview and, therefore, that he can neither show merit to his underlying evidence suppression claim nor satisfy the prejudice prong of the cause and prejudice test, issues that are "coextensive."[11]

### III. Alleged Meaninglessness of the Adversarial Process

Whatley argues that his defense counsel, Johnny Mostiler, had such a heavy caseload as the contract defender for Spalding County that this Court should presume that Whatley's defense suffered prejudice. In general, an ineffective assistance claim can succeed only where the prisoner can show actual prejudice to his or her defense that in reasonable probability changed the outcome of the trial.[12] However, Whatley correctly notes that an exception to this general rule applies and prejudice will be presumed where,

> although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial.[13]

An example of where such extreme circumstances existed is a case where the entire membership of the state bar had been appointed to

---

[11] *Waldrip*, 279 Ga. at 832 (II) (H).

[12] *Strickland v. Washington*, 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984); *Smith v. Francis*, 253 Ga. 782, 783-784 (1) (325 SE2d 362) (1985).

[13] *United States v. Cronic*, 466 U. S. 648, 659-660 (III) (104 SC 2039, 80 LE2d 657) (1984).

defend racially vilified defendants in a highly emotional public setting, where it " 'was a matter of speculation only' " whether *anyone* would actually represent the defendants at trial until the last moment, where "[n]o attempt was made to investigate . . . [and n]o opportunity to do so was given," and where the trial began "within a few moments after counsel for the first time charged with any degree of responsibility began to represent [the defendants]."[14]

Whatley asserts that, during the two-year period when his case was pending, Mostiler represented 70% of 1,558 felony defendants with the remainder being represented by his associate, opened 70 civil cases, represented one murder defendant outside the county, and represented four death penalty defendants. A review of the record reveals that Whatley's assertion may be somewhat exaggerated; however, more importantly, we find that his assertion regarding Mostiler's general caseload is irrelevant. As was noted by the habeas court, it is the amount of time *actually* spent by Mostiler on Whatley's case that matters, not the number of other cases he might have had that *potentially* could have taken his time. The habeas court found that Mostiler was a highly experienced attorney, was experienced in death penalty cases, was appointed two years before Whatley's trial, and "spent over 157 hours on [Whatley's] case in addition to the 96 hours that his investigator logged." The habeas court further noted with approval testimony by the defense investigator stating that it was likely that Mostiler's billing records under-represented the time he actually spent on the case.

The Eleventh Circuit recently addressed a similar claim regarding Mostiler's heavy caseload and its bearing on another death penalty case in which he was defense counsel. Although the case was decided on procedural grounds, the Eleventh Circuit stated the following in dictum:

> As the district court found, Mostiler was an experienced and effective advocate for Osborne. Osborne presented no evidence, other than vague statistics, to support his allegation that trial counsel's caseload impeded his representation. As such, Osborne cannot show that Mostiler's representation fell below an objective standard of reasonableness such that prejudice is presumed.[15]

We agree with the reasoning of the Eleventh Circuit that vague statistics that fail to shed light on the amount of work actually done

---

[14] Id. at 660 (III) (quoting *Powell v. Alabama*, 287 U. S. 45, 56-58 (53 SC 55, 77 LE 158) (1932)).

[15] *Osborne v. Terry*, 466 F3d 1298, 1315, n. 3 (11th Cir. 2006).

in the particular case at issue are insufficient to show the kind of complete breakdown in representation necessary for prejudice to the defense to be presumed.[16]

## IV. Alleged Conflict of Interest

Based on the same allegations regarding his trial counsel's heavy caseload set forth above, Whatley argues that his trial counsel labored under a conflict of interest in violation of the Sixth Amendment. Specifically, Whatley argues that trial counsel was forced to choose between representing Whatley and representing counsel's other clients.

The Supreme Court has cast some doubt on Whatley's assertion that the alleged circumstances in his case should be considered under specialized Sixth Amendment conflict of interest case law requiring presumptions of prejudice rather than under ordinary Sixth Amendment ineffective assistance of counsel case law, because Whatley's case is not a case involving the joint representation of co-defendants and because it appears not to be a case involving other factors that make prejudice both highly probable and exceptionally difficult to prove.[17] However, the discussion below shows that, even assuming that Whatley's allegation of a potential conflict of interest should be subjected to analysis under specialized Sixth Amendment conflict of interest case law, prejudice should *not* be presumed in his case, because he has not shown that an actual conflict of interest adversely affected his trial counsel's performance.

The Supreme Court has emphasized that a trial court should pay special attention to counsel when he or she attempts to satisfy the professional duty to notify the trial court that his or her representation might be compromised by a conflict of interest, and the Supreme Court has stated that it will apply "an automatic reversal rule" where counsel has announced the existence of a conflict of interest arising out of the joint representation of co-defendants "unless the trial court has determined that there is no conflict."[18] However, that particular automatic reversal rule clearly does not apply in Whatley's case, because there was no joint representation of co-defendants and no objection by counsel.

The Supreme Court has further held that, in general, other potential conflicts of interest may warrant a presumption of prejudice only if the defendant proves the existence of a conflict that

---

[16] See *Cronic*, 466 U. S. at 659-660 (III). See also *Williams v. Anderson*, 174 FSupp.2d 843, 874 (V) (D) (N.D. Ind. 2001); *Williams v. State*, 706 NE2d 149, 161 (II) (Ind. 1999).

[17] *Mickens v. Taylor*, 535 U. S. 162, 174-175 (III) (122 SC 1237, 152 LE2d 291) (2002).

[18] Id. at 168 (II) (citing *Holloway v. Arkansas*, 435 U. S. 475 (98 SC 1173, 55 LE2d 426) (1978)).

" 'actually affected the adequacy of [counsel's] representation.' "[19] A trial court certainly bears a duty to inquire into a potential conflict of interest whenever "the trial court is aware of" circumstances creating more than "a vague, unspecified possibility of conflict."[20] However, the Supreme Court has held that a trial court's failure to inquire into the circumstances of a "potential conflict" does not relieve a prisoner of his or her duty to show on appeal that, in fact, a conflict existed that "adversely affected his [or her] counsel's performance."[21]

As the discussion above highlights, Whatley has shown nothing more than "vague statistics[ ] to support his allegation that trial counsel's caseload impeded his representation."[22] Given the time counsel actually dedicated to Whatley's case and the quality of representation that the record shows that counsel provided, Whatley's vague statistics are not sufficient to show the existence of an actual conflict of interest that adversely affected counsel's performance. Accordingly, Whatley is not entitled to any presumption that his defense suffered prejudice.

### V. Alleged Ineffective Assistance of Counsel

In addition to the specialized Sixth Amendment claims discussed above, Whatley also has raised an ordinary ineffective assistance of counsel claim. To prevail on this claim, Whatley must show that counsel's performance fell below constitutional standards and that prejudice of constitutional proportions resulted.[23] To demonstrate sufficient prejudice, Whatley must show that

> there is a reasonable probability (i.e., a probability sufficient to undermine confidence in the outcome) that, but for counsel's unprofessional errors, the result of the proceeding would have been different [cit.].[24]

On appeal, we accept the habeas court's findings of fact unless they are clearly erroneous; however, we apply those facts to the law de novo in determining the reasonableness of counsel's conduct and the

---

[19] Id. at 168 (II) (quoting *Cuyler v. Sullivan*, 446 U. S. 335, 348-349 (100 SC 1708, 64 LE2d 333) (1980)).

[20] Id. at 168 (II).

[21] Id. at 172-173 (II).

[22] *Osborne*, 466 F3d at 1315, n. 3.

[23] *Strickland*, 466 U. S. at 687 (III); *Smith*, 253 Ga. at 783-784 (1).

[24] *Smith*, 253 Ga. at 783 (1).

prejudice resulting from any deficiencies in counsel's conduct.[25] We conclude as a matter of law that, even if counsel performed deficiently in the ways we assume in the discussion below, the absence of those professional deficiencies would not in reasonable probability have resulted in a different outcome in either phase of Whatley's trial, and, accordingly, we affirm the habeas court's denial of Whatley's ineffective assistance claim.[26]

### A. General Matters Regarding the Evidence

As a preliminary matter, we note that much of Whatley's arguments rely upon the description and interpretation of his background in the affidavit testimony of a psychologist and a psychiatrist. Although an expert witness may rely on the statements of others in forming his or her expert opinions, those opinions should be given weight only to the extent that the statements upon which they rely are themselves found to have been proven reliable.[27] An expert witness must *not* be permitted to serve merely as a conduit for hearsay. Therefore, in considering whether a jury in reasonable probability would have been swayed by additional testimony not presented by counsel, we do not assume the correctness of the facts alleged in the experts' affidavits but, instead, we consider the experts' testimony in light of the weaker[28] affidavit testimony upon which that testimony, in part, relied.[29] Accordingly, we give significant weight to the habeas court's finding that Whatley's new experts' affidavits were "of questionable credibility and value."

Also as a preliminary matter, we note that Whatley consistently exaggerates the record by stating that "trial counsel" did not do certain things but neglecting to note that the defense investigator did those things. For example, the defense investigator testified that he met 16 times with Whatley and worked with Whatley to obtain a list of potential witnesses, including witnesses in the District of

---

[25] *Strickland*, 466 U. S. at 698; *Lajara v. State*, 263 Ga. 438, 440 (3) (435 SE2d 600) (1993).

[26] See *Schofield v. Holsey*, 281 Ga. 809, 812, n. 1 (642 SE2d 56) (2007).

[27] *Roebuck v. State*, 277 Ga. 200, 202 (1) (586 SE2d 651) (2003).

[28] In this vein, we note that one affiant, Rarlan Jackson, testified that one of his affidavits contained false testimony obtained by an investigator working for Whatley who misrepresented the affidavit's contents when having Jackson sign it. The habeas court found Jackson's in-court denial of the truthfulness of his affidavit to be credible. Another notarized document, a records release form purportedly signed by Rarlan Jackson, was excluded from evidence by the habeas court because Jackson denied in his in-court testimony that the signature on it was truly his. The investigator involved denied any wrongdoing in either matter. As in another case with similar circumstances, we find these matters "troubling," and we urge the lower courts in such circumstances to make a full inquiry, make any appropriate findings of facts, and take appropriate action in light of those findings of fact. *Holsey*, 281 Ga. at 814, n. 2.

[29] Although the habeas court's findings of fact are sufficient for us to render judgment in Whatley's case, we take this occasion to urge the habeas courts to make detailed findings of fact and credibility and rulings on admissibility where affidavits are submitted as evidence and where such affidavits are relied upon by expert witnesses in forming their opinions.

Columbia. It is entirely reasonable for trial counsel to have delegated an investigation into potential witness testimony to his investigator and to follow up with his own interviews of witnesses when it appeared prudent to do so, which the record shows counsel did. We also note that, because Whatley's trial counsel had passed away before Whatley's habeas proceedings, much of what counsel did must be reconstructed through his files and through the testimony of others involved in the case, and we note that trial counsel's passing does not relieve Whatley of his burden to show counsel's ineffectiveness.[30]

### B. Evidence of Whatley's Background

Whatley argues that trial counsel rendered ineffective assistance by failing to contact certain witnesses and by failing to use the testimony of other witnesses, including, in particular, witnesses from the District of Columbia. Whatley argues that counsel failed to make use of testimony from his mother; however, the defense investigator testified that he made repeated attempts to contact her but that she "was not that cooperative" and that his "first interview with [her] went to hell in a handbasket." Whatley contends that trial counsel failed to contact the defense attorney who had represented him in the District of Columbia; however, the defense investigator testified that he contacted the attorney and then "put him on the phone with" trial counsel when the investigator grew nervous answering the attorney's questions about Whatley's murder case. Whatley argues that trial counsel failed to obtain criminal records in the District of Columbia, but transcripts of Whatley's criminal proceedings were served on defense counsel and placed in the trial record by the prosecution, so trial counsel certainly were aware of them. The psychological records associated with those criminal proceedings are discussed below. Whatley argues that trial counsel rendered ineffective assistance by failing to contact his step-siblings; however, these minors were living with Whatley's uncooperative mother. He argues that trial counsel should have contacted one of his aunts and two of his uncles; however, a review of their affidavit testimony reveals little mitigating evidence that was unknown to trial counsel and that would have been admissible. We note that these affidavits in large part concern things that affected Whatley's family members, such as his mother, aunts, and uncles, rather than things that would have directly affected Whatley.

Whatley argues that trial counsel rendered ineffective assistance in failing to develop evidence regarding Cleveland and Marie Thomas, Whatley's great uncle and great aunt, who raised him but who

---

[30] *Schofield v. Meders*, 280 Ga. 865, 867, n. 2 (632 SE2d 369) (2006).

had passed away by the time of Whatley's trial. First, the evidence shows that the investigation into Whatley's life with the Thomases was not deficient, because the defense investigator testified that he met 16 times with Whatley and contacted the Thomases' son, who testified at trial. Whatley told trial counsel and testified at trial that he had an "ideal" childhood living with the Thomases. Vague allegations now that Cleveland Thomas drank too much, abused Marie Thomas, shared a bed with Whatley, and touched him inappropriately fail to show that the defense team was deficient in its *attempts* to find mitigating evidence, because the defense investigator testified that Whatley never revealed these alleged facts. The allegation that Cleveland Thomas raped Whatley's mother might have been discoverable pre-trial, because there are references to it in her mental health records; however, this allegation, and the alleged fact that she informed Whatley of the rape when he was a boy, would not have been significantly mitigating, particularly in light of the fact that use of the allegations may have offended the jurors if they perceived counsel as attacking the one couple who, while they were still living, had taken care of Whatley.

Whatley argues that trial counsel rendered ineffective assistance by failing to obtain evidence that Whatley, along with other inmates, had been involved in a successful lawsuit against guards at the prison in the District of Columbia where he was previously incarcerated. He argues that evidence that he suffered brutal treatment at the prison could have been used at trial to explain why he never returned to a halfway house in the District of Columbia when he was out past curfew one night. This argument lacks merit, because the jury would not have been significantly swayed by an argument that Whatley's fear of returning to prison justified his escape from the halfway house. Furthermore, Whatley has not shown that he informed his trial counsel of the alleged brutality, and Whatley did not mention being afraid of returning to prison when he testified in the sentencing phase about his escape from the halfway house.

Whatley argues that trial counsel made deficient use of the testimony available from Eugene Watson, a caseworker in the District of Columbia who designed a rehabilitation plan for Whatley as part of Whatley's criminal proceedings there. Based on the testimony of the defense investigator and billing records, it is clear that trial counsel had repeated contacts with Watson and considered Watson's testimony to be the centerpiece of the sentencing phase strategy. The record shows that, not only did counsel communicate with Watson by telephone, but counsel also met with Watson in person several times once he arrived in Georgia and that counsel even arranged to have Watson with him and Whatley in a room near the courtroom during breaks at trial. Watson's habeas testimony

downplaying the level of contact he had with trial counsel does not show the habeas court's conclusion that counsel performed adequately to be error in light of the entire record.

Whatley also argues that trial counsel failed to properly prepare mitigation witnesses for their testimony. The record supports the habeas court's finding that the defense team, through the efforts of both trial counsel and the defense investigator, interviewed the mitigation witnesses and were aware of their potential testimony. Although it might be understandable that those witnesses now state that they felt ill at ease because trial counsel did not give them detailed instructions about what they should expect at trial, it was not unreasonable attorney conduct for trial counsel not to rehearse his witnesses' testimony with them. As the habeas court found and as was supported by the testimony of the defense investigator, trial counsel reasonably chose not to overly prepare his witnesses, because he wanted their testimony to come across as sincere.[31]

Whatley argues that trial counsel failed to obtain several mental health reports that had been prepared in the District of Columbia as a result of his criminal activities there and that trial counsel failed to interview the experts who authored the reports. The habeas court's conclusion that trial counsel performed adequately with regard to these reports is reasonable, as it is supported by the presumption that counsel performed adequately, by documentary evidence showing that counsel obtained a signed release from Whatley and requested the materials from Whatley's caseworker in the District of Columbia, and by testimony from the defense investigator confirming that counsel sought the records from Whatley's caseworker. This conclusion is not made erroneous simply because Whatley's caseworker, in giving his habeas testimony, could not recall providing the materials to counsel. The habeas court also correctly concluded that Whatley would not have been prejudiced by counsel's alleged failure to obtain and use these mental health reports or to present testimony from the experts who authored them. A review of the reports confirms the habeas court's finding that they contain material that would have been damaging to Whatley's mitigation case, including statements that he lacked remorse for his crimes and believed he could "get away with anything." The reports did note signs of neglect by Whatley's biological mother and a potential for psychotic symptoms under stress; however, these tentative findings would

---

[31] Compare *Turpin v. Christenson*, 269 Ga. 226, 234-242 (12) (B) (497 SE2d 216) (1998) (finding ineffective assistance where a mitigation case was "cobbled together at the last minute," where information relevant to mitigation witnesses' cross-examination was not discovered by counsel, and where mitigation witnesses were neither contacted until the last minute nor prepared to testify).

have proved of little effect, particularly in light of the fact that no clear findings of mental illness were noted in another mental health examination performed in preparation for Whatley's murder trial.

Trial counsel presented testimony from Whatley himself suggesting that he was remorseful. However, Whatley argues that trial counsel rendered ineffective assistance by failing to present additional testimony about his alleged remorse from his friends and from jail guards. This additional testimony about Whatley's remorse would not have had a significant impact on the jury, particularly because the prosecutor would have been able to explain Whatley's emotional reaction to learning that the victim had died as being a concern for his own punishment rather than true remorse for his actions.

Whatley argues that trial counsel failed to present any records from his past other than his school records. Other than the records discussed elsewhere in this opinion, Whatley has not elaborated on what records trial counsel failed to obtain or how that failure affected his trial.

### C. Mental Health Evidence

Whatley also argues that trial counsel rendered ineffective assistance in his preparation and use of new mental health evidence. Counsel initially sought funds from the trial court to obtain his own mental health expert. The trial court authorized an initial examination of Whatley by psychologists working for the state mental hospital, Dr. Karen Bailey-Smith and Dr. Margaret Fahey. Counsel received two written reports from the evaluation. Dr. Bailey-Smith gave inconsistent testimony in the habeas proceedings, the balance of which suggested that she possibly spoke with trial counsel but that she could not specifically recall doing so. The defense investigator testified that counsel did communicate with Dr. Bailey-Smith after reviewing her report, and it is clear that counsel did receive a copy of her report. Thus, the evidence supports the habeas court's finding of fact that counsel did communicate with Dr. Bailey-Smith. Whatley faults trial counsel for not providing Dr. Bailey-Smith the mental health evaluations performed in the District of Columbia as a result of his criminal proceedings there; however, she testified in the habeas hearing that they would not have changed her expert opinions if she had seen them pre-trial and, therefore, counsel's use of her report would not have been affected by his alleged failure to obtain the records either in a timely fashion or at all.[32] Dr. Bailey-

---

[32] See *Holsey*, 281 Ga. at 813 (II) (holding that "the critical issue" in such a case is what the expert consulted at the time of trial "would have been willing to testify to had he [or she] been provided the materials trial counsel allegedly failed to provide").

Smith's report did note that Whatley's MMPI-2, a personality inventory, "was suggestive of . . . significant psychopathology" and that Whatley used some "idiosyncratic" words. However, she never concluded that he suffered from psychosis, and, in fact, she testified at the habeas hearing that she "didn't think he had any delusional thoughts" but merely had "some thought patterns that we thought were different and bordered delusional thinking." Furthermore, her report's description of the possible "psychopathology" suggested that Whatley merely had a "boastful and egocentric" attitude and that he had a "form of magical thinking" characterized merely by a belief that he was "unique and special" and had "unique and special powers" to influence others. The diagnostic impression set out in her report contained hints of mitigation, but overall it could have been more aggravating than mitigating. That diagnosis was as follows: "Rule Out [i.e., there are some signs of but not enough to reach a diagnosis of] Bipolar Disorder" and "Personality Disorder NOS [not otherwise specified] with antisocial, borderline, narcissistic, and schizotypal features."

As we noted above, counsel's use at trial of Dr. Bailey-Smith's report would not have been affected if counsel had not failed, as Whatley alleges, to obtain the records from mental health evaluations performed in the District of Columbia as a result of his criminal proceedings. We further conclude as a matter of law that the failure of trial counsel to present the records directly to the trial court in a renewed motion for Whatley's own expert did not result in significant prejudice to his ability to prevail on that motion. The evaluations described in those records had been conducted more than eight years before Dr. Bailey-Smith's, and they reached conclusions similar to, and in some respects less favorable than, the conclusions reached in Dr. Bailey-Smith's report. For example, although the older evaluations referred to Whatley as "evidenc[ing] symptoms of schizophrenia," those symptoms are described in the reports as arising from Whatley's use of illegal drugs.

Whatley also argues that trial counsel performed deficiently in failing to cite certain case law[33] or to request an ex parte hearing in support of his motion for a defense expert. Even assuming counsel performed deficiently in these respects, we conclude that Whatley's motion for his own expert was not prejudiced by those deficiencies.

In light of the foregoing discussion, we conclude as a matter of law that, even given the deficiencies in counsel's performance that

---

[33] To the extent Whatley argues that trial counsel failed to do sufficient legal research in other, unspecified areas, we find that he has shown neither deficient performance nor prejudice.

we have assumed in our discussion above, Whatley's defense was not prejudiced. This is true because, even if counsel had performed in the manner Whatley now says he should have, counsel still would reasonably have declined to renew Whatley's motion for his own mental health expert and because the trial court would have properly denied such a renewed motion if it had been made.[34]

### D. Shackling During the Sentencing Phase

Whatley argues that his trial counsel rendered ineffective assistance by failing to object to his being placed in visible shackles during the sentencing phase, including during his physical demonstration of his version of events for the jury.[35] The Supreme Court of the United States decided in 2005, well after Whatley's trial and direct appeal, that visibly shackling a defendant during the sentencing phase is unconstitutional unless the record shows " 'an essential state interest' — such as the interest in courtroom security — specific to the defendant on trial."[36] The Warden argues that counsel should not be regarded as having performed deficiently by failing to object to the shackling, because the practice had not yet been established as unconstitutional.[37] However, at the time of Whatley's trial, this Court had already strongly suggested in dictum that it was unconstitutional to place visible shackles on a death penalty defendant during the sentencing phase without a showing of particular need.[38] We therefore assume, at least for the purpose of this discussion, that trial counsel performed deficiently in failing to recognize the legal basis for an objection to visible shackling in the sentencing phase.

On direct appeal where unconstitutional shackling has occurred, there is a presumption of harm that can be overcome only upon a showing by the State that the shackling was harmless beyond a reasonable doubt. However, where, as here, the issue is the ineffective assistance of trial counsel in failing to object to such shackling, the petitioner is entitled to relief only if he or she can show that there is a reasonable probability that the shackling affected the outcome of

---

[34] See *Lance v. State*, 275 Ga. 11, 13-14 (2) (560 SE2d 663) (2002) (setting forth the standards by which an indigent defendant's motion for funds for expert assistance should be decided).

[35] See *Whatley*, 270 Ga. at 302 (14) (holding that Whatley had waived his right to complain on direct appeal about his shackling, because he had failed to object at trial).

[36] *Deck v. Missouri*, 544 U. S. 622, 624 (125 SC 2007, 161 LE2d 953) (2005) (quoting *Holbrook v. Flynn*, 475 U. S. 560, 568-569 (106 SC 1340, 89 LE2d 525) (1986)).

[37] See *Overstreet v. State*, 877 NE2d 144, 161-162 (III) (D) (Ind. 2007) (holding that trial counsel's performance should not be deemed deficient because counsel failed to anticipate that the prohibition against shackling defendants during the guilt/innocence phase would be extended in *Deck*, id., to the sentencing phase); *Marquard v. Secretary for the Dept. of Corrections*, 429 F3d 1278, 1313 (IV) (B) (11th Cir. 2005).

[38] See *Moon v. State*, 258 Ga. 748, 755 (12) (b) (375 SE2d 442) (1988) (citing *Elledge v. Dugger*, 823 F2d 1439, 1450-1452 (VI) (11th Cir. 1987)).

the trial.[39] In view of the balance of the evidence presented at his trial, we conclude as a matter of law that Whatley cannot show that his trial counsel's failure to object to his shackling in the sentencing phase in reasonable probability affected the jury's selection of a sentence.

### E. Ballistics Evidence

Finally, Whatley argues that his trial counsel rendered ineffective assistance by failing to obtain funds for a ballistics expert. In support of his argument, Whatley cites the affidavit testimony of an expert witness opining that the evidence in Whatley's case is inconsistent with Whatley's having fired downward toward Tommy Bunn, that it would have been "virtually impossible" for the bullet that struck the service counter to have deflected upward and struck the ceiling, and that the gunshot wound to Ed Allen's chest from a range of 15 to 18 inches could have been inflicted after Allen had stepped over Bunn and had gone around the service counter pursuing Whatley. The habeas court filed an order striking the affidavit, among others, because it was filed without authorization after the close of the evidentiary hearing.

The affidavit alleges that the gunpowder residue pattern associated with the bullet mark on the service counter demonstrates that the bullet was traveling on a trajectory somewhat level with the floor, not sharply downward toward Tommy Bunn. However, this testimony, coupled with the still-uncontradicted trial testimony showing that the bullet that struck the counter very close to Allen's position was fired from a range of approximately eight inches, would have led the jury to conclude, at the most, that the shot was intended for Allen and was fired at very close range before Whatley had retreated from the counter. The affidavit's assertions that the shot that struck the counter could not have also struck the ceiling and that the shot to Allen's chest could have been inflicted as Whatley was exiting and being pursued fail to shed light on the question of whether Whatley fired his pistol before Allen armed himself, particularly given the fact that Whatley fired at least one shot in the direction of either Allen or Bunn from a distance of only eight inches from the counter. Thus, even assuming trial counsel should have obtained expert testimony like that contained in the affidavit, we conclude as a matter of law that Whatley's defense did not, by his being deprived of such testimony at trial, suffer prejudice sufficient to support his ineffective assistance claim. Accordingly, even assuming the habeas court

---

[39] See *Marquard*, 429 F3d at 1312-1314 (IV) (B) (addressing a visible shackling claim and finding no reasonable probability of a different outcome in the sentencing phase).

erred[40] in refusing to consider Whatley's untimely affidavit, such error would be harmless.

### F. Combined Effect of Counsel's Deficiencies

Considering the combined effect of the deficiencies we have assumed in the discussion above, we conclude that those deficiencies would not in reasonable probability have changed the outcome of either phase of Whatley's trial.[41]

### VI. Abandoned Claims

In a footnote, Whatley purports to incorporate by reference "all arguments and claims raised in the habeas court." We deem any additional claims not addressed in this opinion to have been abandoned.[42]

*Judgment affirmed. All the Justices concur, except Hunstein, P. J., who concurs in the judgment only as to Division V (D).*

DECIDED OCTOBER 6, 2008 —
RECONSIDERATION DENIED NOVEMBER 3, 2008.

*Thomas H. Dunn*, for appellant.
*Thurbert E. Baker, Attorney General, Emily R. Roselli, Assistant Attorney General*, for appellee.

---

[40] But see *Bloomfield v. Bloomfield*, 282 Ga. 108, 110 (1) (d) (646 SE2d 207) (2007) (noting the trial court's "broad discretion to reopen evidence" and citing *Page v. State*, 249 Ga. 648, 650-651 (2) (c) (292 SE2d 850) (1982)); *Village Creations, Ltd. v. Crawfordville Enterprises, Inc.*, 232 Ga. 131, 132-133 (206 SE2d 3) (1974) (finding no abuse of discretion where the trial court refused to consider an affidavit filed after the deadline that had been set by the trial court).

[41] See *Holsey*, 281 Ga. at 812, n. 1 (holding that the combined effect of trial counsel's deficiencies should be considered).

[42] See Supreme Court Rule 22; *Head v. Hill*, 277 Ga. 255, 269 (VI) (A) (587 SE2d 613) (2003) (finding death penalty habeas claims abandoned under Supreme Court Rule 22).