## S10A1754. PERKINS v. HALL.

(708 SE2d 335)

NAHMIAS, Justice.

In 1997, a jury convicted David Aaron Perkins of the murder of Herbert Ryals III, and of related offenses, and it sentenced Perkins to death for the murder. This Court affirmed unanimously on direct appeal, for which Perkins had the same counsel. See *Perkins v. State,* 269 Ga. 791 (505 SE2d 16) (1998). With new counsel, Perkins filed a petition for a writ of habeas corpus on September 27, 1999, which was denied more than nine years later, on October 10, 2008. This Court granted Perkins's application for a certificate of probable cause to appeal and requested that the parties address the following four issues: (1) whether the habeas court erred by denying Perkins's claim that his trial counsel rendered ineffective assistance during the sentencing phase; (2) whether the habeas court erred regarding Perkins's claim that he was mentally incompetent during his trial; (3) whether the habeas court erred regarding Perkins's claim regarding three jury notes that were allegedly received by the trial court during Perkins's trial; and (4) what action this Court should take in light of the allegation by three witnesses in the habeas court that they were misled when asked to sign certain affidavits. In addition to these issues, Perkins has raised several others. For the reasons set forth below, we reverse the habeas court's order insofar as it denied Perkins's claim that he was entitled to a new sentencing trial, we affirm regarding the habeas court's denial of Perkins's claim that he was mentally incompetent at the time of trial, and we remand with direction regarding several remaining issues.[1]

---

[1] We trust that the litigation and resolution of this case will proceed with greater speed on remand.

## I. *Factual Background*

In Perkins's direct appeal, we held that the evidence at trial was sufficient to support his convictions for malice murder and possession of a knife during the commission of a felony, and we affirmed his sentence of death based on the aggravating circumstances that the murder was committed while Perkins was engaged in the commission of an aggravated battery and was outrageously and wantonly vile, horrible, and inhuman in that it involved depravity of mind and an aggravated battery to the victim. See *Perkins*, 269 Ga. at 792, 792 n. 1. In brief summary, the evidence at trial showed that, on the morning of August 13, 1995, Perkins was entertaining a neighbor, Herbert Ryals III, who shared an interest in guitar playing. Both men were drinking. Perkins beat Ryals with his guitar, stabbed and cut him 11 times, and hit him in the head with a liquor bottle. The evidence showed that there was an extended struggle throughout the apartment and that Ryals eventually died of blood loss in Perkins's bathroom. Perkins testified at trial that he began stabbing Ryals in self-defense after Ryals hit him from behind unexpectedly and came toward him with "some sharp object." Perkins testified that he then went to the bathroom and "checked my head" and that he resumed his attack on Ryals with the liquor bottle only after Ryals once again began attacking him. However, the evidence indicated that Perkins had no injuries shortly after the murder, and witnesses testified that Perkins had made a comment on the night before the murder suggesting that something untoward might happen later that night because there was a full moon.

## II. *Ineffective Assistance of Counsel During the Sentencing Phase*

Perkins argues that his trial counsel rendered ineffective assistance in that they were insufficiently prepared for the sentencing phase.[2] To prevail on this claim, Perkins must show that his trial counsel rendered constitutionally deficient performance and that actual prejudice of constitutional proportions resulted. See *Strickland v. Washington*, 466 U. S. 668, 687 (104 SC 2052, 80 LE2d 674) (1984); *Smith v. Francis*, 253 Ga. 782, 783-784 (325 SE2d 362) (1985). Counsel's performance is measured according to the professional norms prevailing at the time of trial. See *Hall v. McPherson*,

---

[2] Perkins has also claimed in summary fashion that trial counsel rendered ineffective assistance in the guilt/innocence phase. We deem these unsupported claims to have been abandoned. See Supreme Court Rule 22; *Whatley v. Terry*, 284 Ga. 555, 573 (668 SE2d 651) (2008) (finding claims supported only by an attempt to incorporate arguments in the habeas court to have been abandoned); *Head v. Hill*, 277 Ga. 255, 269 (587 SE2d 613) (2003) (finding claims "lacking in specific argument" to be abandoned).

284 Ga. 219, 221 (663 SE2d 659) (2008). Counsel's performance is considered in light of the circumstances as they existed at the time of trial, and the " 'distorting effects of hindsight' " are disregarded. *Wiggins v. Smith*, 539 U. S. 510, 523 (123 SC 2527, 156 LE2d 471) (2003) (quoting *Strickland*, 466 U. S. at 689). To show sufficient prejudice to prevail on his ineffective assistance claim, Perkins must show that "there is a reasonable probability (i.e., a probability sufficient to undermine confidence in the outcome) that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Smith*, 253 Ga. at 783 (citation omitted). This Court accepts the habeas court's findings of fact unless they are clearly erroneous, but we apply the law to those facts de novo. See *Head v. Carr*, 273 Ga. 613, 616 (544 SE2d 409) (2001). In weighing prejudice, we consider the collective prejudice from all of trial counsel's deficiencies. See *Schofield v. Holsey*, 281 Ga. 809, 811-812, n. 1 (642 SE2d 56) (2007).

A. *Deficient Performance*

There is some tension, if not outright contradiction, between lead counsel's and co-counsel's accounts of who was responsible for preparing for the sentencing phase. Lead counsel testified that the responsibility was co-counsel's, while co-counsel testified that he prepared for the sentencing phase only in consultation with, and under the leadership of, lead counsel. This breakdown of communication and organization seems to explain, at least in part, why Perkins's case was not investigated more throughly than it was. See *Terry v. Jenkins*, 280 Ga. 341, 344 (627 SE2d 7) (2006) (affirming the habeas court's vacating of a death sentence where lead counsel and co-counsel miscommunicated regarding who would be responsible for preparing evidence).

The first aspect of trial counsel's performance that was deficient was their failure to fully investigate whether Perkins had suffered one or more brain injuries prior to his crimes. Perkins's original co-counsel, who was later replaced at his insistence, discovered that Perkins once was attacked by several men with a steel rake, that prongs of the rake were embedded in his skull and had to be removed surgically, and that Perkins ever since has had an identifiable hole in his skull. That lawyer testified in the habeas court that she became concerned that Perkins might have suffered an injury to the frontal lobe of his brain and that she therefore attended a seminar on frontal lobe injuries presented by an Emory University professor. The evidence in the habeas record shows that she sent two requests for medical records regarding treatment Perkins received as a result of the rake incident. However, one of the requests bears what was, or at least *now* is, an incorrect mailing address, and the second request listed an incorrect birth year for Perkins. She testified that she

nevertheless received a response from the hospital, which included Perkins's name and a medical records number but which indicated that the records were too old to still be available; however, habeas counsel have now succeeded in obtaining those records from the hospital. She also testified that Perkins stated to her that he was "not going to be branded as mentally incompetent" and that lead counsel was not interested in pursuing her theory of possible brain damage.

Perkins eventually demanded that she be removed as co-counsel, primarily because she had contacted a woman who had been visiting him at the jail and because she had contacted his jail mates seeking information about his mental condition. As discussed below, lead counsel was unable to persuade Perkins to submit to an examination by a psychiatrist or psychologist. In light of all of the evidence available, it seems that the only manner in which trial counsel clearly rendered deficient performance regarding the rake incident was in not interviewing family members and friends regarding any possible changes in Perkins's behavior following the incident.

Trial counsel also performed deficiently by unduly limiting their interviews of Perkins's family and friends to an unreasonably narrow range of persons. The record indicates that counsel did meet repeatedly with Perkins and his mother and that counsel contacted Perkins's estranged second wife. Counsel also apparently contacted Perkins's aunt but did not ask her about his background. Although the habeas court further found that trial counsel had attempted to contact his father, his sister, and a third person regarding whom the record appears silent, it is clear that these attempts were limited to taking his mother's word at face value that the witnesses were "unavailable" and making some telephone calls that were never returned. Furthermore, there is nothing in the trial or habeas records to suggest that trial counsel attempted to contact any of the numerous other family members and friends who testified in the habeas court.

The habeas court found that trial counsel's failure to take further steps to interview Perkins's other relatives was due to his own resistance to having counsel investigate his background more fully. In his testimony in the habeas hearing, co-counsel gave this account of Perkins's reaction to inquiries about possible mitigating evidence:

> He did not give me a list of things that he didn't want me to do and that he did want me to do. [However, h]e had certain things that he did not want us to go into. He did not want to be labeled crazy. He did not want us to go into a great deal

of his childhood background. He made it pretty . . . clear that he didn't believe . . . that was relevant.

In his deposition, co-counsel gave the following, similar testimony about contacting Perkins's family members:

He made it clear that that's not what he wanted me to do. . . . The other family members were either unresponsive or just unavailable, and he never expressed any desire that I go find them.

Co-counsel testified that he now, in retrospect, believes that he erred too far on the side of establishing a good rapport with Perkins rather than pressing Perkins and other persons for additional mitigating evidence.[3] The ABA Guidelines at the time of Perkins's trial, which this Court has acknowledged may serve as a guide to reasonable defense preparations in capital cases, indicate that trial counsel should conduct an investigation seeking possible evidence for the sentencing phase "regardless of any initial assertion by the client that mitigation is not to be offered." ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (1989), 10.4.1 (C). See also *McPherson*, 284 Ga. at 221 (noting the relevance of published professional guidelines in assessing what might have been reasonable in a particular case).

The ABA Guidelines, at first blush, might appear to be in tension with this Court's previous decisions indicating that the client is ultimately the master of his own defense, including whether or not to present *any* mitigating evidence. See *Colwell v. State*, 273 Ga. 634, 638 (544 SE2d 120) (2001) (holding that the trial court had "properly respected Colwell's right to make the 'ultimate decision about' what sort of case to present" (citation omitted)); *Morrison v. State*, 258 Ga. 683, 685-686 (373 SE2d 506) (1988) (noting that, at Morrison's request, no mitigating evidence was presented). However, we provided a fuller explanation of the correct analysis in discussing the sentencing phase of another capital case:

The record reveals that Mize's lawyers, despite Mize's resistance, conducted some investigation of Mize's background and informed Mize about pursuing a mitigation defense. But the final decision about the defense belonged to Mize.

*Mize v. State*, 269 Ga. 646, 656 (501 SE2d 219) (1998). In other

---

[3] We note that, while this testimony is relevant in assessing what counsel actually did, the question of law regarding the reasonableness of those actions is for this Court to decide.

words, reasonable attorney performance includes investigating mitigating evidence to the extent feasible given the defendant's willingness to cooperate and then, if the defendant insists, following his instructions regarding the ultimate defense to pursue. Perkins's trial counsel plainly failed to take such an approach in investigating his background.

The Warden correctly argues that trial counsel were limited in their ability to investigate Perkins's mental health issues because he steadfastly refused to participate in an evaluation by either the court-appointed expert or by the expert hired privately by his trial counsel with funds provided by the trial court. See *Jenkins v. State*, 265 Ga. 539, 540-541 (458 SE2d 477) (1995) (holding that expert mental health testimony derived from an evaluation of a defendant is admissible only if the defendant cooperates in an evaluation by an expert selected by the State). Nonetheless, we conclude that trial counsel performed deficiently by failing to sufficiently develop mitigating evidence from non-experts in light of the following: (1) the fact that trial counsel had a duty to make reasonable efforts to investigate Perkins's background despite Perkins's resistance to being "labeled [as] crazy" and his resistance to having his background probed deeply; (2) the fact that presenting at least some of Perkins's background was obviously possible, despite his reservations, because trial counsel did in fact present some testimony about his background at trial through his mother; (3) the fact that trial counsel took only limited steps to obtain information from Perkins's family and friends other than his mother and estranged wife; (4) the fact, discussed below, that trial counsel had reason to believe from the evidence that they already possessed that Perkins had a troubled background and a possible brain injury; and (5) the fact that habeas counsel, using methods that were available to trial counsel despite Perkins's lack of cooperation, were ultimately able to develop compelling mitigating evidence.

B. *Prejudice*

Having concluded that trial counsel performed deficiently in obtaining non-expert mitigating evidence for the sentencing phase, we turn to whether that deficiency had a reasonable probability of changing the outcome of Perkins's trial.

The first category of important additional evidence from non-experts concerns Perkins's traumatic childhood. Perkins's mother testified in the sentencing phase. She said that Perkins's father, her ex-husband, slapped and abused her; that, from the time Perkins was three years old, his father would beat him with his fists, hands, and a belt; that Perkins "was very much abused" and that she would step in to take beatings instead of letting him take them; that Perkins's father forbade him from participating in sports after he obtained

only "medium" grades in school; that Perkins's father gave her only ten dollars per week for groceries; that Perkins's father would often stay out for half the night drinking; that Perkins's father was eventually forced out of the family home after she was beaten and left covered with bruises on one particular occasion; and that Perkins wanted to move in with his father at the age of 13 and, upon his arrival at his father's house, was given "a bottle of Jack Daniels and all the pot he could smoke."

Perkins's new evidence of his abusive background is admittedly somewhat cumulative, but overall it is far more compelling: (1) his aunt testified by affidavit that, on one occasion when Perkins was four years old, his father beat him at a picnic with his fists until he collapsed and that, on another occasion, his father beat him with a belt on a camping trip for no reason; (2) his first wife testified by affidavit that his father hit him as an adult "a number of times," that he "would have what [she] call[ed] flashbacks where he would see himself being beaten by his father," and that one night, while he and his father were drinking, his father urinated on him; (3) his father admitted in an affidavit that he "went overboard" hitting Perkins at a picnic when he was three years old, gave him "a number of whippings . . . often times because he just wouldn't listen," and gave him liquor and marijuana from the age of 15 or 16; (4) his mother gave affidavit testimony describing Perkins's somewhat odd religious beliefs; (5) another cousin gave affidavit testimony indicating that Perkins's father would "whip" him with an open hand or a belt for things like breaking a window or tracking in dirt and that he began using drugs at 12 or 13 years old when his father gave them to him; (6) his younger sister gave affidavit testimony indicating that their father hit and bruised their mother and put his hand around her throat and that Perkins once attempted to slit his wrists with a razor blade; (7) his former step-mother gave affidavit testimony indicating that his father gave him drugs and alcohol, was a drunk, and beat him with his fists beginning at age 12 or 13; (8) a friend of his wife gave habeas testimony indicating that she had seen cuts on his wrists; (9) his mother and a cousin gave affidavit testimony indicating that a young male neighbor had raped Perkins when he was eight years old; (10) his wife gave affidavit testimony indicating that his father beat him and his mother when he was a child; and (11) his daughter gave affidavit testimony indicating that he "said sometimes he would re-live the beatings in his mind and that it would freak him out."[4]

---

[4] The testimony at issue in these last three points may be inadmissible hearsay. See *Gissendaner v. State*, 272 Ga. 704, 714-715 (532 SE2d 677) (2000) (addressing the proper

Even more powerful than the evidence of Perkins's traumatic personal background is the additional evidence habeas counsel were able to obtain concerning his change in behavior and apparent mental distress following two head injuries. As discussed above, trial counsel learned pre-trial that Perkins had been attacked with a steel rake when he was approximately 20 years old, that several prongs of the rake had become stuck in his skull and had to be surgically removed, and that he was left with a permanent, identifiable hole in his skull. Pretermitting whether trial counsel performed deficiently in seeking Perkins's medical records regarding this injury, which indicate that two prongs of the rake actually penetrated his brain, we note that testimony from lay witnesses was available that would have shown that Perkins, while somewhat troubled before being injured by the rake, suffered from significant personality and cognitive changes afterward. Furthermore, upon investigating possible consequences from the rake incident, trial counsel would likely have discovered the evidence Perkins presented in his habeas proceedings that, at approximately 18 years old, Perkins was involved in an automobile accident that left him in a coma for five days after the accident and that, as with the rake incident, he suffered from significant personality and cognitive changes afterward.

The relevant new testimony about the effects of these two head injuries was as follows: (1) Perkins's mother gave affidavit testimony indicating that, after the automobile accident, he suffered personality changes, lost approximately six months of memory, slurred his speech constantly, had blurred vision and dizziness, had constant ringing in his ears and blackouts, and had problems with short-term memory and that, after the rake incident, his headaches intensified, he began to drink heavily to numb his pain, he would stare suddenly for several minutes, and he had scars on his wrists; (2) his aunt gave affidavit testimony indicating that, after the automobile accident, Perkins "became more sullen and more prone to act out" and that he "seemed to become more easily agitated, especially when he was drinking"; (3) his ex-wife gave affidavit testimony indicating that, after the automobile accident, Perkins had "blackouts" even when he was not drinking, he once stuck a knife in a couch and shortly afterward seemed not to know who had done it, and he threatened to slit his wrists and that, after the rake incident, he "was really messed up," "would constantly complain of headaches and nausea," and "would drink and smoke pot to try to kill the pain"; (4) his father gave affidavit testimony indicating that Perkins got into a

application of the rules of evidence in the sentencing phase of a death penalty trial). We need not resolve that issue, however, because our finding of prejudice is sufficiently supported without this evidence.

fight suddenly and for no apparent reason and further indicating that to some extent even since childhood he had seemed to suffer from blackouts and sudden and unexplained staring into space; (5) his cousin gave affidavit testimony indicating that, after the automobile accident, Perkins had to be restrained on his hospital bed, "would look at you but not see you," began drinking more heavily, complained of constant headaches, and got into more trouble than before; (6) two other cousins gave affidavit testimony indicating that, after the automobile accident, Perkins had to be restrained on his hospital bed and that his behavior and memory deteriorated after the automobile accident and the rake incident; (7) his younger sister gave affidavit testimony indicating that, after the automobile accident and the rake incident, Perkins "seemed different," had memory problems, would "zone out" more than he had before the accidents, and attempted to slit his wrists; (8) his wife gave affidavit testimony indicating that Perkins had constant headaches from the time she met him, which was after the two head injuries, that he drank to relieve his headaches, that he was often depressed, that he had scars on his wrists, and that he would "zone out" and have memory problems even when he was not drinking or taking drugs; (9) his daughter gave affidavit testimony indicating that Perkins "would break out in a cold sweat and get this odd look in his eyes" as if he were "in a trance"; (10) a friend of his wife gave affidavit testimony indicating that she had seen cuts on Perkins's wrists; (11) one of his friends gave affidavit testimony indicating that, on one occasion shortly after the rake incident, Perkins "went schizo," "started freaking out," threw a five-gallon paint can, "jumped on" the friend, and "was just going nuts" and that, in general after the rake incident, his "normal self wasn't that normal"; and (12) another friend and several jail mates gave further testimony about how Perkins would stare and "zone out."

We note again that, although Perkins resisted investigation of this sort of evidence and refused expert mental health evaluations, he did not preclude his trial counsel from presenting a mitigation defense that included details about his personal history. Compare *Mize*, 269 Ga. at 656. After our review of the non-expert evidence that Perkins's habeas counsel discovered and presented in the habeas court, which would have been available to trial counsel upon a reasonable investigation, we conclude that there is a reasonable probability that the jury would have reached a different outcome in the sentencing phase of Perkins's trial if that additional evidence had been presented at trial. Accordingly, we reverse the habeas court's judgment on this issue and direct that Perkins's current death sentence be vacated.

## III. *Competence to Stand Trial*

### A. *Trial Proceedings on Competence*

Perkins claimed in the habeas court that he had been mentally incompetent at the time of his trial. In the trial court, Perkins initially filed a special plea of incompetence. See OCGA § 17-7-130 (b). The trial court twice authorized an examination of Perkins by a psychiatrist, but Perkins refused to cooperate both times. Perkins explained to the trial court that one reason for his refusal to cooperate was that one of the psychiatrists wanted to talk to "a certain person, such as a wife," who might lie about him. Trial counsel eventually withdrew Perkins's plea of incompetence.

At the hearing in which Perkins formally withdrew his plea of incompetence, trial counsel stated as follows:

> Judge, as we indicated last week I withdrew in open court the special plea that I had filed on behalf of Mr. Perkins and I discussed it with David [Perkins] prior to the hearing. I discussed it with him again this morning and explained to him what we did.
>
> At that time I stated to the Court that the basis of my filing the motion was what I thought was a lack of understanding by Mr. Perkins of what he was facing. We subsequently had a very serious conversation. We spent some time together. I am now of the belief that he does understand what is going on. We have reconfirmed that this morning in his presence. I would once again state that I have withdrawn the special plea that I had previously filed and we are prepared to go forward.

The trial court responded as follows:

> At this time I find the Defendant deliberately refuses to cooperate with the doctor that the Court has appointed and asked to examine him, that he is waiving his right to any such test unless he agrees to cooperate. And that's a deliberate and intentional act by the Defendant, and it's calculated to create error in this case. And he is waiving his right to a hearing if he does not ask for one and cooperate with the doctor.

The trial court continued as follows:

> I've seen him and observed him here in the courtroom, looked like a sane person. The law, presumed to be sane. I don't see anything wrong with his actions or his reactions.

> And he's explained to me his reason. I accept his explanation for that. If he wishes to do that, he has a right to do that.

Perkins and his counsel never raised the issue again in the trial court.

## B. *Procedural Default*

### 1. *Georgia Precedent*

The habeas court correctly concluded that Perkins's claim that he was tried while incompetent is, at least as an initial matter, barred by procedural default because the claim was not pursued to a conclusion at trial and was not raised on direct appeal. See *Head v. Thomason*, 276 Ga. 434, 441 (578 SE2d 426) (2003) ("The habeas court correctly found Thomason's claim he was tried while incompetent was barred by procedural default and no cause or prejudice had been shown to overcome that bar."). See also OCGA § 9-14-48 (d) (establishing statutory procedural default doctrine for habeas proceedings).[5] Perkins's attempt to distinguish his case from *Thomason*, based on the fact that Thomason actually obtained a verdict on his competence in the trial court while Perkins did not, is unpersuasive. Thomason raised the issue of his competence pre-trial, obtained an unfavorable verdict on the issue, and then chose to appeal based solely on the fact that a "not guilty" plea had been entered on his behalf before his competency trial rather than also appealing the soundness of the subsequent competency trial verdict. See *Thomason*, 276 Ga. at 441; *Thomason v. State*, 268 Ga. 298, 308 (486 SE2d 861) (1997). An issue becomes subject to procedural default when the defendant fails to raise the claim *either* at trial *or* on direct appeal. See OCGA § 9-14-48 (d) ("The court shall review the trial record and transcript of proceedings and consider whether the petitioner made timely motion or objection or otherwise complied with Georgia procedural rules at trial *and* on appeal. . . ." (emphasis added)); *Head v. Ferrell*, 274 Ga. 399, 401 (554 SE2d 155) (2001) ("Claims, other than those regarding sentencing phase jury instructions in death penalty trials, that are raised for the first time in habeas corpus proceedings that could have been raised at trial *or* on direct

---

[5] OCGA § 9-14-48 (d) provides as follows:

> The court shall review the trial record and transcript of proceedings and consider whether the petitioner made timely motion or objection or otherwise complied with Georgia procedural rules at trial and on appeal and whether, in the event the petitioner had new counsel subsequent to trial, the petitioner raised any claim of ineffective assistance of trial counsel on appeal; and absent a showing of cause for noncompliance with such requirement, and of actual prejudice, habeas corpus relief shall not be granted. In all cases habeas corpus relief shall be granted to avoid a miscarriage of justice. . . .

appeal are barred by procedural default unless the petitioner can meet the 'cause and prejudice' test." (emphasis added)). For purposes of determining whether procedural default doctrine will apply, we do not see a meaningful distinction between the failure to exercise a defendant's right to have his competence determined in the trial court and the failure to exercise a defendant's additional right to have a competency determination evaluated on appeal.

2. *Related Federal Case Law*

We also reject Perkins's argument that, in light of case law from some federal courts, we should overrule *Thomason* and declare substantive claims of incompetence to stand trial categorically exempt from procedural default. These courts, most notably the Eleventh Circuit, base their position on the United States Supreme Court's statement in *Pate v. Robinson* that " 'it is contradictory to argue that a defendant may be incompetent, and yet knowingly or intelligently "waive" his right to have the court determine his capacity to stand trial.' " *Adams v. Wainwright*, 764 F2d 1356, 1359 (11th Cir. 1985) (quoting *Pate v. Robinson*, 383 U. S. 375, 384 (86 SC 836, 15 LE2d 815) (1966)). The Eleventh Circuit bases its position on binding precedent from the old Fifth Circuit. See id. (citing cases dating back to *Bruce v. Estelle*, 483 F2d 1031, 1037 (5th Cir. 1973)).[6]

At the time *Bruce v. Estelle* was decided, however, "procedural default" in federal habeas corpus was treated as the equivalent of deliberate "waiver." See *Fay v. Noia*, 372 U. S. 391, 438-439 (83 SC 822, 9 LE2d 837) (1963) (holding that "the federal habeas judge may in his discretion deny relief to an applicant who has deliberately bypassed the orderly procedure of the state courts and in so doing has forfeited his state court remedies" and emphasizing that "[t]he classic definition of waiver . . . — 'an intentional relinquishment or abandonment of a known right or privilege' — furnishes the controlling standard" (citation omitted)). However, the United States Supreme Court soon limited and ultimately rejected the "deliberate bypass" approach to procedural default, and for almost two decades now federal habeas courts have been required to apply procedural default (absent a showing of cause and prejudice or a miscarriage of justice) based on independent and adequate state procedural rules, including rules by which claims are deemed waived by inaction

---

[6] Even the Eleventh Circuit requires "procedural" incompetency claims to be raised on direct appeal – the type of claim at issue in *Pate v. Robinson* involving the trial court's sua sponte duty to hold a competency hearing where the facts raise a "bona fide doubt" regarding the defendant's competence to stand trial. See, e.g., *James v. Singletary*, 957 F2d 1562, 1572 (11th Cir. 1992). Likely for this reason, Perkins's briefs in this appeal identify his incompetency claim as "substantive."

rather than by proof of the intentional relinquishment of a known right. See *Wainwright v. Sykes*, 433 U. S. 72, 87-88 (97 SC 2497, 53 LE2d 594) (1977) (holding that a state court's application of its contemporaneous objection rule procedurally barred federal habeas relief, limiting *Fay v. Noia*'s "sweeping" dicta); *Coleman v. Thompson*, 501 U. S. 722, 750 (111 SC 2546, 115 LE2d 640) (1991) (holding that a state court's decision implicitly based on the failure to file a timely appeal procedurally barred federal habeas relief, explicitly rejecting *Fay v. Noia*).

Accordingly, several federal circuits have rejected the Eleventh Circuit's "expansive reading of *Pate*," finding that approach "untenable when applied to a case in which the State has raised the defense of procedural default, rather than waiver," with respect to a substantive claim of incompetence to stand trial. *Martinez-Villareal v. Lewis*, 80 F3d 1301, 1307 (9th Cir. 1996) (citing cases). We believe the Ninth Circuit's view properly recognizes that "[t]he analytical basis of a defense of waiver differs markedly from that of a defense of procedural default." Id. See also *Noble v. Barnett*, 24 F3d 582, 588 (4th Cir. 1994) (discussing the same analytical difference between waiver doctrine and successive petition (abuse of the writ) doctrine). This view is also consistent with our holding in *Thomason*, a case decided long after *Pate v. Robinson* and *Adams v. Wainwright*, which applied procedural default to bar a claim of incompetency to stand trial, see 276 Ga. at 441, in accordance with Georgia's broad rule that alleged errors must be raised in the trial court and on direct appeal. See OCGA § 9-14-48 (d). We therefore hold that, notwithstanding the contrary position of some federal courts, substantive claims of incompetence to stand trial will continue to be subject to procedural default in Georgia.

C. *Cause and Prejudice*

A claim that is subject to procedural default may nevertheless be considered in habeas corpus proceedings if the petitioner can satisfy the cause and prejudice test. See id.; *Ferrell*, 274 Ga. at 401. A common method of satisfying the cause and prejudice test is to show that trial and direct appeal counsel rendered ineffective assistance, see *Turpin v. Todd*, 268 Ga. 820, 824-826 (493 SE2d 900) (1997), and ineffective assistance is the only argument that Perkins offers to excuse the procedural default of his claim that he was incompetent at trial. Similar to other claims of ineffective assistance, a habeas petitioner seeking to overcome a procedural default must show professionally deficient performance by trial or direct appeal counsel and that the deficiencies had a reasonable probability of changing the outcome of the trial. See *Strickland*, 466 U. S. at 687; *Hall v. Lewis*, 286 Ga. 767, 769 (692 SE2d 580) (2010). Because a showing of

ineffective assistance of counsel regarding a procedurally defaulted issue requires a showing of prejudice that is comparable to the prejudice that must be shown under the cause and prejudice test, a petitioner who has shown the former will be deemed to have automatically shown the latter. See *Todd*, 268 Ga. at 828-829.

We hold, however, that Perkins has failed to prove that his trial counsel rendered ineffective assistance regarding his competence to stand trial. Our discussion regarding Perkins's claim that his trial counsel rendered ineffective assistance in the sentencing phase obviously implicates a number of mental health issues, including childhood abuse, substance abuse from a young age, and repeated head injuries that, according to lay witnesses, affected Perkins's personality, demeanor, memory, and self-control. However, the issue of Perkins's competence to stand trial was much narrower than the extremely broad issue of mitigating evidence in the sentencing phase. As we explained in a case where the defendant actively sought the death penalty, a defendant may suffer even extreme mental health problems and still be competent to stand trial because he can "underst[and] the nature and object of his proceedings and . . . possess[es] the intellectual and communication skills necessary to participate in his" defense. *Colwell*, 273 Ga. at 636. See also *Stripling v. State*, 261 Ga. 1, 2 (401 SE2d 500) (1991) (setting forth the same competency test).

Trial counsel withdrew Perkins's plea of incompetence only after satisfying themselves that they were able to communicate effectively with him. Perkins's previous co-counsel had reported that Perkins claimed to have received communications from God in the form of androgynous faces visible in the clouds, but despite the odd and possibly delusional nature of this claim, there is no evidence that trial counsel found that it prevented Perkins from comprehending the nature of the proceedings or assisting in his defense. Likewise, Perkins's unwillingness to cooperate with a mental health evaluation and his demonstrative behavior at trial, which trial counsel described (after trial in his habeas testimony) as "bizarre," did not show that he was unable to understand the proceedings or assist in his defense. Moreover, trial counsel attempted to have Perkins evaluated by several psychiatrists, but he refused, and they also unsuccessfully moved the trial court to have Perkins moved to a psychiatric hospital for an extended period of observation. Thus, the absence of an expert evaluation of Perkins was not attributable to any deficiencies of trial counsel. Finally, the trial court had an extensive opportunity to observe Perkins in pre-trial and trial proceedings, and to interact directly with him, and the court did not

see sufficient indications of incompetence to pursue further evaluation.[7]

We conclude that the information that trial counsel then had available to them, including the information that we have found that trial counsel unreasonably failed to obtain, would not have led constitutionally effective counsel to pursue a claim of incompetence to stand trial and would not be reasonably probable to have resulted in a finding that Perkins was incompetent had such a plea been pursued. Accordingly, the habeas court correctly concluded that ineffective assistance of trial counsel could not be used to excuse the procedural default of Perkins's claim that he was mentally incompetent during his trial.

D. *Miscarriage of Justice*

In addition to the cause and prejudice exception, OCGA § 9-14-48 (d) provides an exception to the procedural default rule where necessary "to avoid a miscarriage of justice." Like its non-statutory federal counterpart, our statutory miscarriage of justice exception has always been interpreted as a very narrow exception tied to evidence of *actual innocence*, thereby advancing the fundamental purpose of the habeas writ, "which is to free the innocent wrongfully deprived of their liberty." *Valenzuela v. Newsome*, 253 Ga. 793, 796 (325 SE2d 370) (1985). In *Valenzuela*, we noted the federal analogue and explained that

> the [miscarriage of justice] term is by no means to be deemed synonymous with procedural irregularity, or even with reversible error. To the contrary, it demands a much greater substance, approaching perhaps the imprisonment of one who, *not only is not guilty of the specific offense for which he is convicted, but, further, is not even culpable in the circumstances under inquiry*.

Id. (emphasis added). See also *Sawyer v. Whitley*, 505 U. S. 333, 339, 347 (112 SC 2514, 120 LE2d 269) (1992) (equating the "miscarriage of justice" exception with "actual" or "factual" innocence and reiterating its "narrow scope," while holding that it applies to eligibility for the death penalty as well as for conviction of a crime).

Perkins has not argued that the miscarriage of justice exception applies to his claim that he was incompetent to stand trial. Never-

---

[7] The trial court should not, however, have relied on any finding that Perkins had personally "waived" his right to a mental health evaluation and a competency hearing or had acted "deliberately and intentionally," because, as the United States Supreme Court stated in *Pate v. Robinson*, "it is contradictory to argue that a defendant may be incompetent, and yet knowingly or intelligently 'waive' his right to have the court determine his capacity to stand trial." 383 U. S. at 384.

theless, the dissent asserts that applying the exception to Perkins' claim is simply an application of our decision in *Turpin v. Hill*, 269 Ga. 302 (498 SE2d 52) (1998), where we held that the exception applied to a claim of mental retardation that would preclude a death sentence. See id. at 303; Dissenting Op. at 832. There are two major problems with the dissent's approach. First, it requires overruling *Thomason*, a unanimous opinion decided five years *after Hill*, which did *not* apply the miscarriage of justice exception to the same type of incompetency claim, instead finding the claim procedurally defaulted. See *Thomason*, 276 Ga. at 441. Moreover, the *Thomason* Court was clearly aware of the exception, which is discussed in the sole case cited in support of the procedural default holding. See id. (citing *Ferrell*, 274 Ga. at 401-402, which in turn cites and discusses *Valenzuela*, noting that "an extremely high standard applies in such [miscarriage of justice] cases"). The dissent simply ignores this stare decisis issue.

Second, the claim in this case is entirely different from the claim at issue in *Hill*. Mental retardation fits the traditional conception of a "miscarriage of justice," because a mentally retarded defendant is constitutionally ineligible to be executed and therefore actually innocent of culpability for a death sentence. See *Fleming v. Zant*, 259 Ga. 687, 690 (386 SE2d 339) (1989) (applying Georgia Constitution). Accord *Atkins v. Virginia*, 536 U. S. 304, 321 (122 SC 2242, 153 LE2d 335) (2002) (applying the United States Constitution). By contrast, a mentally retarded defendant may be *convicted* of a crime, and thus *Hill* noted that the procedural default rule would still apply to claims of mental retardation used to challenge guilt-innocence phase issues. See 269 Ga. at 303, n. 2.

The rationale of *Hill* might extend to a claim that Perkins was mentally incompetent (i.e., insane) *at the time of his crimes*, because that would make him actually innocent of the offenses. See OCGA § 16-3-2 ("A person shall not be found guilty of a crime if, at the time of the act, omission, or negligence constituting the crime, the person did not have mental capacity to distinguish between right and wrong in relation to such act, omission, or negligence."). The rationale might also extend to a claim that Perkins is insane *now*, because that would make him constitutionally ineligible to be executed.[8] But that

---

[8] See *Ford v. Wainwright*, 477 U. S. 399, 410 (106 SC 2595, 91 LE2d 335) (1986) (prohibiting execution of a prisoner who is insane); id. at 422-423 (Powell, J., concurring in part and concurring in the judgment) (explaining that sanity in this context requires death row prisoners to "know the fact of their impending execution and the reason for it"). After *Ford*, Georgia established a separate procedure to address claims that a prisoner is "mentally incompetent to be executed," OCGA § 17-10-60 et seq., which is the exclusive procedure for raising such a challenge after sentencing, see OCGA § 17-10-62, and creates a rebuttable presumption against re-litigation of a finding of competency instead of applying the stricter

is not the claim that Perkins seeks to raise; instead, he seeks review of his claim he was incompetent *at the time of trial*. That issue does not relate to his *culpability* or "actual innocence" — his factual innocence of or ineligibility to be punished for the crimes he was accused of committing. It is instead a *trial right* — a due-process based protection designed to ensure that he received a fair trial. See *Drope v. Missouri*, 420 U. S. 162, 171-172 (95 SC 896, 43 LE2d 103) (1975).

Indeed, even if Perkins was incompetent at the time of his trial and is incompetent today, if he could be rendered competent in the future (even by forcing him to take medication), he could be lawfully tried, convicted, and sentenced to death once again. See OCGA § 17-7-130 (h) (allowing the State to file a motion for rehearing at any time after a defendant has been found incompetent to stand trial, upon a showing that his mental condition has changed); *Riggins v. Nevada*, 504 U. S. 127, 135 (112 SC 1810, 118 LE2d 479) (1992) (holding that a state may under some circumstances treat a defendant against his will to render him competent to stand trial). In short, someone who is mentally competent (sane) when he commits a crime is *culpable* for that offense, even if his later incompetency prevents him (perhaps only temporarily) from being *tried* for the offense.

The dissent also asserts that *Hill* was based on the rationale that mental retardation was "such a critical constitutional matter that allowing a waiver thereof would be a miscarriage of justice," and says that "the right not to be tried while incompetent" is similarly critical. See Dissenting Op. at 832. But *Hill* did not say that its holding was based on the importance of the constitutional matter at issue there, and we are aware of no case in which this Court (or any other appellate court) has extended the "miscarriage of justice" exception beyond claims that a defendant is actually innocent to claims involving trial rights, no matter how important those rights may be. See *Valenzuela*, 253 Ga. at 796 (explaining that "the term [miscarriage of justice] is by no means to be deemed synonymous with procedural irregularity, or even with reversible error"). As discussed above, the federal courts have vigorously debated whether procedural default should apply to substantive claims of incompetency to stand trial, but none of those courts has suggested that the miscarriage of justice exception would apply in any event. Moreover, habeas petitioners in Georgia courts routinely raise trial rights of the highest constitutional importance, including the right to be present

habeas procedural default standard, see OCGA § 17-10-69. Accordingly, this issue should not arise in habeas proceedings in Georgia.

during trial,[9] which are routinely denied as procedurally defaulted. See, e.g., *Ferrell*, 274 Ga. at 402 (holding procedurally barred, and not applying the miscarriage of justice exception to, claims including closing the courtroom during trial, the defendant's constructive absence from court during trial, erroneous jury instructions on reasonable doubt, involuntariness of guilty pleas, and racial discrimination in seeking the death penalty).

Even if the dissent's theory could be restricted to incompetency to stand trial claims, which we doubt, it would not be limited to the comparatively few defendants on death row like the mental retardation claim at issue in *Hill*. Instead, the dissent would now allow any convicted defendant to raise an incompetency to stand trial claim for the first time in a habeas petition, which the habeas court would have to resolve on the merits, or even perhaps in a successive habeas petition, if the claim was not previously adjudicated on the merits. That is hardly the sort of "rare occasion" that the miscarriage of justice exception was intended to cover. *Valenzuela*, 253 Ga. at 796. Therefore, we decline the dissent's invitation to overrule *Thomason* and to venture down the path of excusing procedural default whenever the court in a habeas corpus proceeding believes a "critical" constitutional trial right is at issue.

## IV. *Notes Received by the Trial Court from the Jury*

Perkins's habeas counsel discovered the existence of three notes,

---

[9] As the dissent notes, see Dissenting Op. at 832-833, the prohibition against trying a criminal defendant who is not mentally competent at trial is often analogized to the prohibition against trying a defendant who is not physically present at trial. See, e.g., *Drope*, 420 U. S. at 171. The right to be present during all critical stages of trial is indeed a fundamental component of due process, and we recently reiterated that a violation of that right "is not subject to harmless error review *on direct appeal*." *Ward v. State*, 288 Ga. 641, 646 (706 SE2d 430) (2011) (emphasis added). However, this Court has repeatedly held that a convicted defendant's claim that he was absent during trial, if not properly raised at trial and on direct appeal, can be barred by procedural default *on habeas corpus review*, never before suggesting that the miscarriage of justice exception would apply categorically to such a claim. See *Thomason*, 276 Ga. at 441; *Ferrell*, 274 Ga. at 402; *Davis v. Turpin*, 273 Ga. 244, 249 (539 SE2d 129) (2000) (Hunstein, J.) ("Davis claimed in the habeas court that his constitutional rights were denied by his alleged absence during critical stages of his trial proceedings. . . . We hold that the habeas court correctly determined that this claim was procedurally defaulted because it was not raised on direct appeal and find that the procedural bar erected by the failure to raise this claim on direct appeal has not here been overcome by a showing of sufficient cause and prejudice."). The point is that the miscarriage of justice exception has never been based on the alleged violations of constitutional rights that might entitle a prisoner to habeas relief if reviewed on the merits; instead, the exception serves as a safety net, allowing a habeas court to overlook procedural rules to consider constitutional claims in the "extraordinary case" where a prisoner can make a substantial showing that he was convicted despite being actually innocent and being unable to attribute the procedural default to an external cause such as ineffective assistance of counsel. *Murray v. Carrier*, 477 U. S. 478, 495-497 (106 SC 2639, 91 LE2d 397) (1986).

written by the jury to the trial judge, that had not been included in the record on appeal. The notes, not necessarily in chronological order, read as follows:

> May we please have the Legal Definitions of Malice Murder & Voluntary Manslaughter?
> 1. Does the defendant have the right to speak in his behalf after found [sic] guilty and before sentencing?
> 2. If he does, is he willing to?
> 3. The jury would like to hear him.
> We, the jury, have a question concerning our safety. Will our names be protected from the defendant and the defendant's family?

Perkins claimed in the habeas court that he was entitled to a new trial because the trial court had not informed him about these notes or any responses made by the trial court to them. The habeas court ordered that a hearing be held by the trial court to reconstruct the factual details surrounding the notes.[10]

The habeas court correctly concluded that, as an initial matter, Perkins's claim regarding the notes was procedurally defaulted because that claim was not raised in the trial court or on direct appeal. The critical inquiry here, however, is whether the habeas court correctly found that Perkins had failed to show cause and prejudice sufficient to overcome the procedural default as to any of the notes. See *Ferrell*, 274 Ga. at 401-402.

The transcript of the special hearing held in the trial court during the habeas proceedings clearly supports the implicit finding of fact in the habeas court's order that neither Perkins, his counsel, nor the prosecutor were informed about these notes by the trial court. The trial court had a duty to inform the parties of any questions from the jury that were material to the jury's deliberations so that the trial court's responses, or lack thereof, could be objected to. See *Morris v. State*, 257 Ga. 781, 784 (364 SE2d 571) (1988) ("[A]ny answers to such questions [from the jury] must be given in open court with the accused and his counsel present."). Cause sufficient to overcome procedural default exists where "interference by governmental officials" has prevented a defendant from raising a claim at trial and on direct appeal, *Todd*, 268 Ga. at 825, and we hold that the trial court's failure to disclose any of the jury communica-

---

[10] This Court has previously sanctioned the use of OCGA § 5-6-41 by habeas courts for the purpose of directing a trial court to reconstruct an incomplete trial record. See *Russell v. Evans*, 260 Ga. 754, 755 (400 SE2d 11) (1991); *Zant v. Cook*, 259 Ga. 299, 299-300 (379 SE2d 780) (1989).

tions that were material to its deliberations constitutes such interference by a governmental official.

We also hold that the prejudice required to overcome procedural default in the habeas corpus context is not the strong (albeit rebuttable) presumption of prejudice that might apply if this claim regarding jury notes were being considered on direct appeal. See *Burtts v. State*, 269 Ga. 402, 403-404 (499 SE2d 326) (1998) (noting, on direct appeal, that "unless the character of the communication clearly shows that it could not have been prejudicial to the accused, the presumption of law would be that it was prejudicial, and the accused would be entitled to another trial." (punctuation omitted)). The general rule is that presumptions of harm that would have applied on direct appeal do not apply on habeas corpus to procedurally defaulted claims. See *Todd*, 268 Ga. at 828. Although Perkins argues that this case presents the type of "compelling circumstances" that this Court previously indicated might warrant an exception to this general rule, id., we now hold that such an extraordinary exception should apply only where dictated by constitutional law or where clearly necessary to avoid a miscarriage of justice under OCGA § 9-14-48 (d). Because no such extraordinary circumstances exist here, we hold that the prejudice that must be shown to overcome the procedural default of Perkins's claim is actual prejudice.

Having laid out the general background of Perkins's claim regarding the jury notes at issue and the law applicable to this claim, we now address each note separately.

A. *Note Regarding Voluntary Manslaughter*

The habeas court found that the jury's note regarding the definition of malice murder and voluntary manslaughter was withdrawn by the jury. Consequently, Perkins cannot show prejudice regarding the trial court's failure to inform him of the note, regardless of when it was received, and the habeas court did not err by refusing to grant relief based on this note.

B. *Note Regarding Perkins's Testimony*

The habeas court found that the trial court responded to the jury's question about whether Perkins "ha[d] the right to speak in his behalf after found [sic] guilty and before sentencing" by writing the following response: "The evidence is closed. You have heard all the remarks from both sides." Although the habeas court did not make an explicit finding on this point, this note and response were obviously written at some time after the jury began deliberating, and the question was clearly material. If the note was received while the jury was deliberating in the sentencing phase of Perkins's trial, the question of prejudice is moot in light of our decision to vacate Perkins's death sentence on other grounds, and therefore we need

not address whether the trial court's failure to inform defense counsel about the note may have affected their sentencing phase strategy. But even if the note was received while the jury was deliberating in the guilt/innocence phase, Perkins was not prejudiced by the trial court's response, which reflects an appropriate exercise of discretion. See *Burtts*, 269 Ga. at 403-404 (holding that an unobjectionable ex parte response to a jury's question was not harmful even under the standard applied on direct appeal); *State v. Roberts*, 247 Ga. 456 (277 SE2d 644) (1981) (holding that a trial court has the discretion to grant or deny a motion to reopen the evidence during jury deliberations). Accordingly, there is no need for the issue of this note to be addressed on remand.

C. *Note Regarding the Jury's Safety*

The note in which the jurors expressed concern for their safety is a different matter. We accept the habeas court's implicit finding that Perkins was not informed about the note and its explicit finding that the trial court did not respond to the note, and the note's subject matter clearly was material to the jury's deliberations *if* the note was written prior to the conclusion of those deliberations. If the jury sent the note while it was deliberating over Perkins's guilt or his sentence, the trial court's failure to advise the parties of this inquiry and to respond appropriately amounts to actual prejudice. This is because the note, if written during deliberations, would clearly indicate that the jurors were being actively distracted from their duties by serious and inappropriate external concerns. However, the habeas court's order makes no finding of fact regarding when the note was written, and we therefore must remand for a finding as to whether the note was written before the conclusion of the jury's deliberations. Because we have already vacated Perkins's death sentence on other grounds, the remaining relevant inquiry is only whether the note was written prior to the conclusion of the jury's deliberations in the guilt/innocence phase.

V. *Witnesses Allegedly Misled Into Giving False Testimony*

The record contains three affidavits in which witnesses allege that earlier affidavits bearing the witnesses' signatures were obtained through deceit and were false in material part. This situation has arisen with alarming regularity in death penalty habeas corpus cases, and this Court has already twice stated in opinions that it finds the matter "troubling." *Whatley*, 284 Ga. at 565, n. 28; *Holsey*, 281 Ga. at 814, n. 2. We have urged the habeas courts that encounter such circumstances "to make a full inquiry, make any appropriate findings of facts, and take appropriate action. . . ." *Whatley*, 284 Ga. at 565, n. 28. Accordingly, and particularly because we are remand-

ing this case for other reasons, we direct the habeas court on remand to conduct a hearing to determine whether there has been any intentional misconduct on the part of either the witnesses or the persons who obtained their affidavits and, if so, to take any action the court deems appropriate, including contempt sanctions or referral to the appropriate district attorney for possible criminal prosecution.

## VI. *Remaining Claims*

A. Perkins's remaining claims regarding the sentencing phase of his trial and his sentence are moot in light of this Court's decision to vacate his death sentence.

B. Perkins presents no authority for his argument that all of his habeas claims should be considered together with all of the claims he previously raised on direct appeal, and we reject that argument. See *Holsey*, 281 Ga. at 811-812, n. 1 (noting that this Court does not recognize the cumulative error rule).

C. On direct appeal, this Court rejected Perkins's argument that it was a violation of the Georgia Code and was unconstitutional to admit the hearsay statements of his estranged wife at trial under the necessity exception to the hearsay rule. See *Perkins*, 269 Ga. at 795-796. Perkins's current argument that the use of the hearsay statements violated the new rule of constitutional law announced in *Crawford v. Washington*, 541 U. S. 36 (124 SC 1354, 158 LE2d 177) (2004), does not warrant relief on habeas corpus, because that new rule is not given retroactive effect to cases no longer in the "pipeline" of trial and direct appeal. See *Whorton v. Bockting*, 549 U. S. 406 (127 SC 1173, 167 LE2d 1) (2007); *Hill*, 277 Ga. at 257.

D. Perkins has claimed in summary fashion that his counsel rendered ineffective assistance in several general respects on direct appeal. We deem these unsupported claims to have been abandoned. See Supreme Court Rule 22; *Hill*, 277 Ga. at 269.

E. Perkins's remaining claims are barred by procedural default because they were not raised at trial and on direct appeal, including his claims that several witnesses committed perjury, that the State failed to correct false testimony, that the trial court erred by failing sua sponte to order its own inquiry into Perkins's competence, and that the prosecutor made improper arguments. Perkins has failed to even attempt to show cause and prejudice to overcome the bar to these procedurally defaulted claims. See *Ferrell*, 274 Ga. at 401.

*Judgment affirmed in part, reversed in part, and case remanded with direction. All the Justices concur, except Hunstein, C. J., and Benham, J., who concur in part and dissent in part.*

HUNSTEIN, Chief Justice, concurring in part and dissenting in part.

I agree with most of the majority's opinion in this case; however, I dissent to the majority's refusal to apply the miscarriage of justice exception to Perkins's claim that he was mentally incompetent at the time of his trial. Although the habeas court correctly applied this Court's existing case law, Perkins raises an issue never directly confronted by this Court. Perkins notes that the Eleventh Circuit Court of Appeals treats claims of incompetence at trial as *never* being subject to procedural default. That court bases its approach on language from the Supreme Court of the United States indicating that " 'it is contradictory to argue that a defendant may be incompetent, and yet knowingly or intelligently "waive" his right to have the court determine his capacity to stand trial.' " *Adams v. Wainwright*, 764 F2d 1356, 1359 (II) (A) (1) (11th Cir. 1985) (quoting *Pate v. Robinson*, 383 U. S. 375, 384 (II) (86 SC 836, 15 LE2d 815) (1966)). See also *Johnston v. Singletary*, 162 F3d 630, 637 (11th Cir. 1998). Several other federal courts of appeals have also concluded that claims of incompetence that were not asserted at trial should not be subject to procedural default. See *Ryan v. Clarke*, 387 F3d 785, 791 (III) (8th Cir. 2004) ("*Pate* stands for the specific proposition that a defendant who fails to raise competency at trial or on direct appeal does not waive his right to raise the issue in post conviction relief proceedings."); *Nguyen v. Reynolds*, 131 F3d 1340 (III) (10th Cir. 1997). But see *Martinez-Villareal v. Lewis*, 80 F3d 1301, 1306-1307 (9th Cir. 1996) (holding that procedural default *should* apply to claims of incompetence). While I find persuasive these federal courts' reasons for not treating the issue of incompetence at trial as being subject to procedural default, I would resolve this issue on a similar principle embodied in the Georgia Code and already applied by this Court in a similar situation.

The statute providing generally for procedural default where issues are not raised at trial and on direct appeal also provides as follows: "In all cases habeas corpus relief shall be granted to avoid a miscarriage of justice." OCGA § 9-14-48 (d). We have applied this provision to cases where a death penalty defendant's mental retardation was not determined by a jury at trial but where he has succeeded in proving it on habeas corpus. See *Turpin v. Hill*, 269 Ga. 302 (3) (b) (498 SE2d 52) (1998). In such cases, we have deemed the prohibition on executing the mentally retarded to be such a critical constitutional matter that allowing a waiver thereof would be a miscarriage of justice. Id. Similarly, I would hold now that the right not to be tried while incompetent is such a critical constitutional matter that permitting the waiver of that right by one who was truly incompetent at trial would constitute a miscarriage of justice. A

defendant who was subjected to trial while incompetent was, in essence, personally absent from the *entirety* of his or her trial through no fault of his or her own. See *Ling v. State*, 288 Ga. 299 (1) (702 SE2d 881) (2010). From the perspective of such a defendant, it is as though he or she was never afforded a trial at all. Thus, this situation is not, as the majority asserts, merely a procedural trial irregularity. Instead, it approaches the very absence of a trial. Under such circumstances, the core concerns of the miscarriage of justice exception are clearly implicated.

As we did regarding mental retardation, I would hold that the same standard should apply on habeas corpus as would have applied at trial. *Turpin*, 269 Ga. at 303-304 (4). The standard at trial for claims of incompetence is proof of incompetence by a preponderance of the evidence. See *Lewis v. State*, 279 Ga. 69, 70 (3) (608 SE2d 602) (2005) ("A defendant bears the burden of establishing incompetency to stand trial by a preponderance of the evidence, and this burden is consistent with principles of due process."). Because the habeas court has not explicitly applied the standard that I believe we should adopt regarding claims of incompetence at trial, I would remand this matter for consideration of whether Perkins can prove now by a preponderance of the evidence that he was incompetent at the time of trial.

I am authorized to state that Justice Benham joins in this dissent.

DECIDED MARCH 18, 2011.

*Patrick Hickey, Claire Harrison, Jeffery L. Ertel*, for appellant.
*Thurbert E. Baker, Attorney General, Paula K. Smith, Patricia B. Attaway Burton, Senior Assistant Attorneys General, Richard Tangum, Assistant Attorney General, Emily R. Roselli*, for appellee.