294 Ga. 855
FINAL COPY

S13A1472, S13X1473. HUMPHREY v. WALKER; and vice versa.

BLACKWELL, Justice.

In 2002, Artemus Rick Walker was tried by jury and convicted of the murder of Lynwood Ray Gresham, as well as several related crimes. For the murder, he was sentenced to death, and for the other crimes, he was sentenced to terms of imprisonment. On direct appeal, this Court affirmed his convictions and sentences. See Walker v. State, 282 Ga. 774 (653 SE2d 439) (2007). Then, in 2009, Walker filed a petition for a writ of habeas corpus. Following an evidentiary hearing, the habeas court granted the writ. Although it found that some claims asserted by Walker were procedurally barred, not cognizable in habeas proceedings, or otherwise without merit, the habeas court concluded that several of his claims had merit. In particular, the habeas court concluded that Walker was denied due process by having been tried while incompetent, and it concluded as well that he was denied the effective assistance of counsel, not only with respect to his competence, but also with respect to the presentation of certain defenses and mitigating evidence involving his mental health. Based on

these conclusions, the habeas court granted the writ and vacated both the convictions and sentences. In Case No. S13A1472, the Warden appeals from the grant of the writ, and in Case No. S13X1473, Walker cross-appeals. In light of the deference that we owe to the factual findings of the habeas court, we affirm the grant of the writ in the appeal by the Warden. By our affirming the grant of the writ, the cross-appeal is moot, and we dismiss it.

I. *The Factual Circumstances of the Crimes*

On direct appeal, we summarized the factual circumstances of the crimes of which Walker was convicted as follows:

> [Walker] devised a plan to rob Lynwood Ray Gresham, who was the vice president of the bank that was next door to the service station Walker owned. Walker hired Gary Lee Griffin several days before the crimes to work at his service station and asked Griffin if he would help "rob and kill" a "rich" man. On May 12, 1999, Walker borrowed an automobile that belonged to another of his employees and drove with Griffin to the hotel where Griffin was staying. They picked up Griffin's bicycle at the hotel and then traveled in the automobile to Walker's apartment. Walker gave Griffin black pants to change into and gave him a knife and a stun gun. Walker also changed into black clothing. They also loaded alker's bicycle into the automobile.
> Walker drove the pair with their bicycles to a place near Gresham's house and parked, and they rode the bicycles to Gresham's house. Griffin waited at the side of the house as Walker went to the door and engaged Gresham in a conversation in the front yard. Walker and Gresham began struggling. Walker told Griffin to use the stun gun on Gresham, but Griffin refused. Griffin also refused when Walker told him to stab Gresham with the knife.

Griffin gave Walker the knife, and Walker stabbed Gresham 12 times in the chest and back. Walker told Griffin to pick up things that had fallen during the struggle, which included Gresham's keys and wallet. Walker dragged Gresham, who was still alive, to the side of the house and hid him in some bushes, where he was later found dead. Walker then told Griffin that he had "one more to kill" and asked Griffin for Gresham's keys. Walker tried to open the door to Gresham's house, but Gresham's wife, Roberta Gresham, locked a chain lock and a foot lock from inside. Roberta Gresham called the police, and she observed Walker, with whom she was familiar, through a window with "something on his hip that looked like a gun." Roberta Gresham's daughter, Allison, yelled to Walker that she had a gun. Walker and Griffin then rode away on their bicycles. Griffin was arrested nearby after he crashed his bicycle. The victim's wallet was found in Griffin's pocket, and a broken stun gun was found on Griffin's belt. Walker was arrested a few hours later after he was discovered in the woods nearby. The victim's blood was on Walker's clothes, and he had the victim's keys. The knife used to kill Gresham and a pistol were discovered near the site of Walker's arrest.

282 Ga. at 774-775 (1).[1]

## II. *Competence at the Time of Trial*

We begin with the claim that Walker was denied due process because he was incompetent at the time of his trial, one of the claims upon which the habeas

---

[1] Also on direct appeal, we noted that "Griffin has been adjudicated mentally retarded, making him ineligible for a death sentence." Id. at 782 (14).

2

court granted the writ.[2] It long has been settled that the constitutional guarantee of due process forbids the conviction of one who is incompetent. Pate v. Robinson, 383 U. S. 375, 378 (I) (86 SCt 836, 15 LE2d 815) (1966). An accused is incompetent to stand trial if he is without the "ability to understand the nature and object of the proceedings going on against [him], to comprehend [his] own condition in reference to such proceedings, and to render [his] attorneys such assistance as a proper defense to the indictment preferred against [him] demanded." Norris v. State, 250 Ga. 38, 42 (3) (295 SE2d 321) (1982). See also Godinez v. Moran, 509 U. S. 389 (113 SCt 2680, 125 LE2d 321) (1993) ("The standard for competence to stand trial is whether the defendant has 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and has 'a rational as well as factual understanding of the proceedings against him.'" (Citation omitted)). And as we have explained,

---

[2] We begin with this claim for reasons of judicial economy. If the habeas court was correct that this claim is not procedurally barred and has merit, Walker would be entitled to have his convictions and sentences set aside, and it would be unnecessary for us to reach the remaining claims upon which the habeas court granted relief. Some of those remaining claims — ineffective assistance of counsel, for instance, with respect to the presentation of mitigating evidence in the sentencing phase of the trial — would entitle Walker only to more limited relief. Accordingly, it makes sense to begin with the claim that would, if meritorious, entitle Walker to the full scope of the relief that the habeas court awarded.

3

the constitutional requirement of trial competence is rudimentary, for upon it depends the main part of those rights deemed essential to a fair trial, including the right to effective assistance of counsel, the rights to summon, to confront, and to cross-examine witnesses, and the right to testify on one's own behalf or to remain silent without penalty for doing so.

Sims v. State, 279 Ga. 389, 390 (1) (614 SE2d 73) (2005) (citations and punctuation omitted). A claim that an accused is not competent, however, must be asserted in the court of conviction and on direct appeal, and if such a claim is not so asserted, it ordinarily is barred by procedural default and cannot, therefore, be later asserted in habeas proceedings. Perkins v. Hall, 288 Ga. 810, 820 (III) (B) (1) (708 SE2d 335) (2011). See also Head v. Thomason, 276 Ga. 434, 441 (578 SE2d 426) (2003). But "[a] claim that is subject to procedural default may nevertheless be considered in habeas corpus proceedings if the petitioner can satisfy the cause and prejudice test." Perkins, 288 Ga. at 822 (III) (C). The habeas court acknowledged that Walker never asserted in the court of

4

conviction that he was incompetent to stand trial, but it found adequate cause and prejudice to overcome the procedural default.

A. Cause and Prejudice

"A common method of satisfying the cause and prejudice test is to show that trial and direct appeal counsel rendered ineffective assistance,"[3] Perkins, 288 Ga. at 822 (III) (C) (citation omitted), and that is the ground upon which the habeas court here found sufficient cause and prejudice to overcome the bar of procedural default. With respect to cause and prejudice, the habeas court reasoned as follows:

> While it is true that [Walker]'s due process claims are procedurally defaulted, as [Walker] failed to raise these claims in a motion for new trial or in his direct appeal to the Georgia Supreme Court, the Court finds that [Walker] has shown it was caused by his trial and appellate counsel's ineffectiveness for failing to pursue a mental health investigation. [Walker] was prejudiced by this failure in that his competency to stand trial was never evaluated or litigated. . . .

[3] As we have explained before, because a claim of ineffective assistance of counsel "requires a showing of prejudice that is comparable to the prejudice that must be shown under the cause and prejudice test, a petitioner who has shown the former will be deemed to have automatically shown the latter." Perkins, 288 Ga. at 822-823 (III) (C) (citation omitted).

5

The Warden contends that the record does not sustain this finding of cause and prejudice, and as we consider this contention, we look first to the familiar and settled principles that govern claims of ineffective assistance.

To show a denial of effective assistance, Walker had to prove both that the performance of his lawyers was deficient and that he was prejudiced by this deficient performance. Strickland v. Washington, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). To prove that the performance of his lawyers was deficient, Walker was required to show that the lawyers performed their duties in an objectively unreasonable way, considering all the circumstances, and in the light of prevailing professional norms. Id. at 687-688 (III) (A). See also Kimmelman v. Morrison, 477 U. S. 365, 381 (II) (C) (106 SCt 2574, 91 LE2d 305) (1986). This is no easy showing. As the United States Supreme Court has explained:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from

counsel's perspective at the time. . . . There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

Strickland, 466 U. S. at 689-690 (III) (A) (citations omitted). See also Humphrey v. Nance, 293 Ga. 189, 191 (II) (A) (744 SE2d 706) (2013). To these ends, the law recognizes a "strong presumption" that counsel performed reasonably, Strickland, 466 U. S. at 689 (III) (A), and Walker bore the burden of overcoming this presumption. See id. To carry his burden, Walker had to show that no reasonable lawyer would have done what his lawyers did, or would have failed to do what his lawyers did not, see Nance, 293 Ga. at 192 (II) (A) (1), or put another way, that his lawyers "made errors so serious that [they were] not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Harrington v. Richter, ___ U. S. ___ (IV) (131 SCt 770, 178 LE2d 624) (2011) (citation and punctuation omitted). And to carry that burden, Walker had to show these things by competent evidence, for a silent or ambiguous record is not sufficient to overcome the presumption. Shaw v. State, 292 Ga. 871, 874 (3), n. 5 (742 SE2d 707) (2013).

7

Even when a petitioner has proved that the performance of his lawyers was deficient in a constitutional sense, he also must prove prejudice by showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U. S. at 694 (III) (B). See also Williams v. Taylor, 529 U. S. 362, 391 (III) (120 SCt 1495, 146 LE2d 389) (2000). This does not, of course, require a showing that it is "more likely than not" that the result of the proceeding would have been otherwise but for the errors of the lawyers. See Schofield v. Gulley, 279 Ga. 413, 416 (I) (A) (614 SE2d 740) (2005). But "[i]t is not enough to show that the errors [of counsel] had some conceivable effect on the outcome of the proceeding." Richter, ___ U. S. at ___ (IV) (citation and punctuation omitted). Rather, the petitioner must show a "reasonable probability" of a different result, which, the United States Supreme Court has explained, is "a probability sufficient to undermine confidence in the outcome." Strickland, 466 U. S. at 694 (III) (B). Put another way, to show prejudice, "[the] errors [of counsel] must be so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Richter, ___ U. S. at ___ (IV) (citation and punctuation omitted).

8

In all, the burden of proving a denial of effective assistance of counsel is a heavy one. See Kimmelman, 477 U. S. at 382 (II) (C). See also Richter, ___ U. S. at ___ (IV). Whether a petitioner has carried his heavy burden is a question committed in the first instance to the habeas court, and even on appeal, we must defer to its findings of fact unless those findings are clearly erroneous, see Perkins, 288 Ga. at 812 (II), that is, unless those findings are without *any* evidentiary support. See Reed v. State, 291 Ga. 10, 13 (3) (727 SE2d 112) (2012). We also must yield to the judgment of the habeas court with respect to the credibility of witnesses who testified in the habeas proceedings. See Turpin v. Lipham, 270 Ga. 208, 211 (3) (510 SE2d 32) (1998) ("[W]e accept the habeas court's factual findings *and credibility determinations* unless clearly erroneous. . . ." (emphasis supplied)). See also Whatley v. Terry, 284 Ga. 555, 565 (V) (A), n. 29 (668 SE2d 651) (2008) (urging the habeas courts to make explicit findings regarding the credibility of witnesses). We owe no deference, however, to the conclusions of law drawn by the habeas court, and we apply the law ourselves to the material facts of the case. See Perkins, 288 Ga. at 812 (II).

As we noted earlier, the habeas court concluded in this case that Walker was denied the effective assistance of counsel because his counsel unreasonably

9

failed to more thoroughly investigate his mental health, and a more thorough investigation, the habeas court found, would have supplied evidence that Walker was not competent to stand trial. In support of this conclusion, the habeas court made extensive factual findings. In particular, the habeas court found that counsel had serious concerns — and had good reasons to be so concerned — about the mental health of their client and whether Walker could adequately understand the proceedings and assist counsel. In light of those concerns, counsel made some effort to procure an evaluation of his mental health, making arrangements for Walker to be examined by a psychologist. But when Walker refused to submit to be examined, counsel abandoned altogether their efforts to have his mental health professionally evaluated, without consulting with the psychologist about feasible alternatives to a personal examination. If counsel had so consulted with the psychologist, they would have learned that he could render an opinion about the mental health of their client even without Walker submitting to an examination. And from evidence that was known or otherwise available to counsel, the psychologist would have concluded that Walker likely was not competent to stand trial. It was unreasonable for counsel to abandon their investigation of Walker's mental health as they did, the habeas court

10

concluded.[4] From our review of the record — which, given the deference we

owe to the habeas court, we must view in the light most favorable to its factual

[4] As a summary of its thinking about ineffective assistance, the habeas court explained:

Despite numerous red flags signaling that Mr. Walker suffered from a severe mental illness, defense counsel in Mr. Walker's case failed to conduct a thorough investigation of Mr. Walker's mental health, failed to seek expert evaluation and advice on his mental health and competency to stand trial[,] and failed to raise his competence to stand trial. As a result of counsel's substandard and incomplete investigation, counsel failed to protect Mr. Walker's right to be competent during the trial and post-trial proceedings. . . . Had counsel properly investigated Mr. Walker's mental health, there is a reasonable probability that . . . Mr. Walker would have been found incompetent to stand trial. . . .

. . .

Throughout Mr. Walker's trial and direct appeal proceedings, Mr. Walker's interactions with each and every member of his defense counsel team raised substantial concerns in all of their minds about their client's mental health, yet counsel ignored critical red flags and unreasonably abandoned efforts to investigate Mr. Walker's competency to stand trial or proceed on direct appeal. Counsel's failure was not the result of a strategic decision, as Mr. Walker's trial counsel had sought to have Mr. Walker evaluated by a psychologist precisely because of their many concerns. According to trial counsel, no mental health evaluation was conducted because Mr. Walker refused to be seen by Dr. Donald Meck, the psychologist contacted by defense counsel. Counsel thereafter abandoned all further efforts to investigate what counsel clearly believed to be Mr. Walker's mental illness. Given counsel's concerns and observations of symptoms of mental illness, counsel's failure to inquire further was unreasonable. The evidence shows, further, that Mr. Walker's psychotic disorder rendered him unable to assist his counsel or to make a rational choice not to be evaluated. The Court finds that counsel's inaction was the result of inattention, not strategy, and was thus constitutionally deficient.

11

findings — we cannot say that the factual findings of the habeas court are clearly erroneous. And accepting those factual findings, we also cannot say that the habeas court erred in its application of the pertinent legal principles to the facts.

In the court of conviction, Walker had three lawyers. At first, he was represented by William Murray, whom the trial court appointed soon after Walker was arrested. Because Murray was not qualified to defend a case in which the State sought the death penalty, Herbert Wells and Jeffrey Grube later were appointed to represent Walker, and Murray left the case. Wells and Grube represented Walker at trial. All three lawyers testified in the habeas proceedings.

According to the habeas court, each lawyer had good reasons to be concerned about the competence of their client, and each lawyer, in fact, had such concerns. The record shows that Murray was worried that Walker "did not have good contact with reality," and Murray testified that he did not think that Walker "had a full grasp of where he was and what he was about to face or what it was that he was, in fact, accused of doing." Walker had an "almost manic nature about him," Murray said, and Walker would "comment in a very, very aggressive, animated manner . . . on the topic of himself and his place in life."

Murray explained that Walker appeared to be "obsessed with religion and saw himself as a preacher or prophet." Indeed, according to Murray, religion was the only subject about which Walker had any interest discussing with him. And although Murray acknowledged that he had a good relationship with Walker and that he generally was able to communicate with Walker — as a religious person himself, Murray was able, he explained, to talk with Walker about religion — religion was "an ever present thought" for Walker, which "seemed to permeate and be the basis of every explanation, every conclusion." Murray noted as well that Walker would speak about his impending return to preaching, and Murray believed that Walker did not grasp his legal situation. In addition, Murray pointed to a disjointed and nonsensical letter that Walker had sent to him recently, and he testified that the recent letter was similar to other letters that Walker sent to him early in the case. When Wells and Grube appeared to defend Walker, Murray told them that he "was very concerned about [Walker's] grasp of the situation and his mental competence to offer effective assistance in preparing a defense."

Wells and Grube represented Walker in the later stages of the pretrial proceedings and at trial, and the record shows that they too had reasons to be

concerned — and, in fact, were concerned — about Walker's mental health. During that time, Wells was the lead counsel, but he admitted in the habeas proceedings that "[Walker] refused to cooperate with me in any way, any way. He just wouldn't even talk to me about the case," and so, he left it to Grube to meet with Walker and to interview Walker's relatives. About the mental health of his client, Wells admitted, "I could see a problem but I'm not a psychologist or a psychiatrist, I couldn't tell you what the problem is. . . ." Wells said that, whenever defense counsel attempted to talk with Walker about the uses to which mental health evidence might be put in his case, Walker would respond by recounting how many months, weeks, and days that he had been in jail and demanding to know why he had not yet been released. Finally, Wells testified that, at the beginning of his trial, Walker announced that he would be represented by an unnamed civil rights attorney from Atlanta, but no such lawyer appeared.

Before representing Walker, Grube never had been involved in a death penalty case. He testified that he met with Walker "many, many times," and he thought that he and Walker had a "pretty good relationship." He also testified, however, that he "sometimes didn't feel like [he] was getting through" to

14

Walker. According to Grube, Walker "was always angry." Grube did not know if Walker "ever did really trust [him,]" and he "just felt like [he] never could get through to [Walker] or never could reach [Walker] with where [he] wanted to go with" the case. Grube believed that Walker "did not understand how critical the facts of the case were and how damning the facts of the case were," and he believed as well that Walker did not appear to grasp the seriousness of his situation. In addition, Grube explained that, although Walker made no effort to interfere with their investigation of the evidence of his guilt, Walker clearly did not want his lawyers to investigate any potentially mitigating evidence. Grube admitted that he had concluded that "there has got to be something wrong" with Walker, that Walker seemed "grandiose" and "thought he was untouchable," and that he suspected that "some sort of mental health issue" was preventing him from "getting through to [Walker] as to what he was facing, as far as the facts [were] concerned." Grube testified that he received letters from Walker filled with religious matters that seemed "way out there," including some matters that, despite his being a religious person himself, he simply "didn't understand." He added that these letters "went beyond" the "odd correspondence from clients" that he had previously received, involving "accusations and conspiracy theories

15

and things of that nature." He also admitted that Walker spoke no differently in person than he wrote in his strange letters. Grube testified that Walker claimed "that he would have lawyers from other places, civil rights lawyers, all sorts of different lawyers, that were going to take his case over," but Grube never believed that any such lawyers existed. Like Wells, Grube said that he thought Walker was in need of an evaluation of his mental health. In concluding his testimony, Grube summarized his concerns about Walker's case as follows:

> Well, I mean, I felt, you know, once again, I mean, it all gets back to the fact that through the entirety of me representing him that I felt like there was a mental health issue. What it was I don't know and I needed somebody to tell me. And I never had that opportunity to present whatever that would be to a jury.[5]

[5] The trial record also reflects some additional reasons that Wells and Grube had to be concerned about Walker's mental health. Although their client objected to any mitigation witnesses, Wells and Grube offered two witnesses at the sentencing phase of trial. And although our present focus is on the performance of counsel with respect to competence to stand trial, the brief and relatively undeveloped trial testimony of these two witnesses sheds some light on additional information that was readily available to trial counsel from relatives of their client, and clearly was known by trial counsel by the conclusion of the trial. Walker's uncle, George Walker, Jr., testified mostly about Walker's goodness as a person, but he also shed some light on Walker's unusually strong focus on religion, including Walker's refusing to play with other youths, instead continuously reading his Bible. Testimony from Walker's mother, Joanne Paul, although undeveloped in comparison to the habeas testimony discussed below, offered a glimpse into Walker's unusual religious practices and the possibility that they were rooted in delusional thoughts. Although she praised the religious dedication of her son, she explained that she had concerns about his overconfidence about his future as a prominent religious leader. She said that Walker had engaged in "two 40-day fasts in one year" at the age of nineteen. She also explained that, after he lost his job, Walker spent "[q]uite a bit" of time away from home and claimed to have spent this time visiting with and

16

The habeas court also found that, although counsel arranged for Walker to be examined by a psychologist, counsel abandoned their efforts to have his mental health evaluated when Walker refused to be examined, without even consulting the psychologist (or any other mental health professional) about feasible alternative means of evaluating their client. Wells and Grube both testified that, in light of their concerns about Walker, they procured funds and made arrangements for Dr. Donald Meck, a psychologist, to examine Walker. But Walker refused to submit to any examination, insisting, Wells recalled, that there was nothing wrong with him. At that point, counsel gave up any effort to have Walker professionally evaluated. Although Grube was charged with talking with Walker, he explained that he did not attempt to press Walker on a mental health examination, principally because "it [was] Mr. Walker's case," and it was, therefore, Walker's decision to make.[6] More significant, Wells and Grube also made no effort to consult with Dr. Meck — or any other mental health professional, for that matter — about the extent to which he might be able

even living with several high-profile television ministers.

[6] Grube also said that he was worried about complicating his relationship with Walker. But Grube made clear that his primary reason for not pressing Walker was simply his deference to Walker's wishes, notwithstanding his concerns that Walker did not adequately understand the proceedings.

17

to evaluate Walker by alternative means, even without Walker submitting to an examination. Indeed, the record shows that, after Wells and Grube made arrangements for Dr. Meck to examine Walker, Dr. Meck never heard from them again.

The habeas court found as well that there were feasible alternative means by which a mental health professional — specifically, Dr. Meck — could have evaluated Walker and formed an opinion about his competence. In the habeas proceedings, Dr. Meck testified, and he explained his involvement in the case before trial. According to Dr. Meck, Grube contacted him and told him "that he couldn't get through to [Walker] and he didn't understand what was going on with him but that it was obvious that something was going on." Dr. Meck further explained, however, that he never was given any background materials about Walker, and counsel never contacted him again after Walker refused to submit to an examination. After personally interviewing some of the other witnesses who appeared in the habeas proceedings, reading affidavit testimony of other habeas witnesses, reviewing letters from Walker to various persons and other documentary materials, and observing the testimony at the habeas hearing,

18

Dr. Meck was able to give detailed opinion testimony about Walker's mental state at the time of trial, even without Walker submitting to an examination.[7]

The evidence upon which Dr. Meck based his opinions was substantially available to counsel at and before the time of trial, the habeas court found. Again, we see no clear error in this finding. That evidence is outlined below.

Walker's mother, Joanne Paul, testified in the habeas proceedings that Walker had twice fasted for forty days over the course of only one year. She also testified that Walker "would be in his bedroom the entire 40 days" and would slip notes under his door to signal when he needed honey, milk, and water to consume during the otherwise total fast.

Walker's brother, Cornelia Walker, confirmed the fact of Walker's extensive fasting, and he described how the family became concerned when Walker's fasting began to extend to 40 or 45 days at a time, with Walker being entirely secluded in his room alone with no lights, and with the curtains drawn. He described how Walker would eat nothing and would drink only water,

---

[7] Even in the habeas proceedings, Walker would not submit to an examination by Dr. Meck. Dr. Meck explained that, after Walker twice refused to meet with him for a formal examination, he "tried to indirectly meet with [Walker] by asking him to answer a few questions concerning testimony and what his friends were saying about him, to try and just open some rapport, and [Walker] refused to answer them because [Dr. Meck] was not religious enough."

lemon, and honey that he would obtain from family members by slipping notes under his door, asking that these items be left at his door for him. Cornelia also described how Walker wore only his underwear and appeared pale, dehydrated, and disheveled on the rare occasions that Walker allowed himself to be seen during his fasts. He added that Walker had grand plans for founding his own "big ministry" named "King of Kings," but he shared that Walker's plans to instantly establish and head such a ministry seemed unrealistic. He discussed how Walker began sometimes wearing a robe and carrying a tall wooden staff to church. He testified about trouble involving Walker at Christ Church of Universal Love. Finally, he provided information about strange letters that Walker had written from jail to his sisters, which the sisters could not understand and caused them concern. The letters discussed persons whom Walker wanted to contact for help, but they also wandered "more or less all over the place" in incomprehensible content, including discussions regarding the founding of his "King of Kings" ministry and cut-and-pasted materials from newspapers.

Walker's older sister, Sandra Walker, provided important details about his background. She described how Walker engaged in fasts of up to 40 days "in a

dark place with his Bible," during which he would only speak to her through the door, "would almost always be in his closet," and would consume only water, milk, and honey. She reported that Walker would write during his long fasts, but she "couldn't really understand [any]thing that he ever wrote," adding, "I don't even know if he understands a lot of it that he writes." She described how, following his fasts, Walker would become animated and would begin making pronouncements of what God had told him, although she often found these pronouncements incomprehensible. She said that Walker began to sometimes arrive to preach in church wearing a robe and a crown-like headpiece and carrying a staff, and she described how his sermons seemed incomprehensible, but how Walker was self-assured that anyone who could not understand his sermons was simply not on his "level." She reported that Walker became socially isolated and that he would sometimes be gone with no one knowing where he had gone. She explained how, after leaving home and about a year before the murder, Walker would refuse to allow his family members inside his apartment, would engage only in short conversations outside, and would "shy away" from anyone who did not agree with the strange things that he would say.

James Feazell, Sr., who had been a mentor to Walker and had been very close to him, explained that Walker was an effective youth preacher at the age of 16 or 17, but he later began to change. Feazell, Sr., said that, when Walker was about 19 years old, Walker's mother asked him to come to see Walker during one of the 40-day fasts because she was concerned about Walker, who was refusing to come down from his room. Feazell, Sr., described how Walker had been like a son to the bishop at Christ Church of Universal Love, but how their relationship was shattered when Walker appeared in church wearing a robe, carrying a staff, and declaring that he "was Moses" and was now the leader of the bishop's church. Finally, Feazell, Sr., described strange letters that he received from Walker after Walker moved to Georgia, how the letters "just started going downhill in terms of coherence," and how the letters were plainly troubling in character by the year 2000, two years before Walker was tried. He explained that these letters in 2000 were similar in character, although not quite as extreme, as the absolutely bizarre letters that Walker sent to him in 2010, which are in the record.

Pamela Hobbs attended Christ Church of Universal Love with Walker. She described Walker's initial success at the church and his gradual decline into

22

strange behavior. She also described how Walker was "kind of like the golden child" at the church, but how he began to essentially stalk her, repeatedly and sometimes angrily informing her that she had been appointed by God to be his wife. She also shed light on the unusual nature of Walker's fasting, explaining that other members of the church would fast only for a part of each day and would not go into seclusion for long periods of time like Walker did. She described how Walker "began to wear robes" to church when no one else ever wore robes, and how he at least once carried a staff and wore a headpiece "like a mitre," which seemed "very strange" to her within the context of their church practices. She explained how Walker's sermons as a youth preacher became "more rambling" and very negative in their focus. Finally, she described letters that Walker would send to her with clippings glued to them, in which Walker declared that she was to be his wife, threatened her harm if she would not marry him, and spoke about religious matters in a way that she "could never make any sense out of." She added that these letters that "would just be kind of all over the place, but . . . repeated over and over." She added that she "thought it was the writing of somebody who was just crazy."

James Feazell, Jr., explained that he was very close to Walker during his youth and that he, Walker, and several other boys would spend a great deal of time together at his home. Now himself a pastor, Feazell, Jr. explained how Walker began as a "dynamic" youth preacher, but "just changed" over time and began to give sermons that Feazell, Jr., and others "just didn't understand." He described how Walker "stopped smiling" and became isolated from his former friends, how Walker would give people a "piercing type stare," and how he began to avoid Walker because he "felt at the time that [Walker] had lost it." He further described how Walker began wearing a robe and carrying a staff to church when no one else in the church ever did so, which he found to be "crazy." He said that the congregation of the church was "stunned" one night when Walker entered the church, came to the pulpit, and "started saying that the bishop and the mother [i.e., the bishop's wife] have demons and he's going to cast demons out of them." He explained that he had read letters that Walker sent to his father, but he "couldn't grasp what [Walker] was saying" in them, and he thought that "there was no rhyme or reason" to them. His account was paralleled by Otis Calhoun, one of the friends who spent time with Feazell, Jr., and Walker. Calhoun also reported that Walker had been a happy and normal child,

24

but he "became obsessed" with religion, began fasting "for extended periods of time holed up in his house," and became socially isolated.

James Byrd, Sr., who was Walker's former bishop and personal mentor at Christ Church of Universal Love, offered further confirmation of Walker's decline into mental illness in his late teens. The bishop explained how Walker "started acting inappropriately and went off the deep end," and how Walker came to think that "he was a prophet and that God had given him some kind of special agenda to carry out." He described how Walker began "fasting for 40 days at a time while shutting himself up in his house," and how "[i]t got to the point where [Walker] would rarely socialize or leave his house." He further explained that Walker's fasting habits were unlike those of other church members, and how Walker "took it to extremes" in his view. He described one pivotal night at the church as follows:

> While the service was in progress, [Walker] walked in while wearing a white suit and walking with a staff, approached the organist, asked him to stop playing and announced that he had learned some things from God and asked to address the entire congregation from the pulpit. I allowed him to do so. [Walker] then announced that he learned, directly from God, that I was a false pro[phe]t and that my wife was the Witch of Hindu. He went on to say that God told him that he was supposed to take over control of

25

my church. [Walker's] behavior was very bizarre and we escorted him out. . . .

The bishop also described how Walker returned on another occasion and "made a second attempt to seize control of [the bishop's] church" by "announcing that God told him that he was to lead [the bishop's] congregation" and that he had been directed by God to "spend the entire night in the church." On this second occasion, the bishop had Walker's mother and stepfather come to the church, and they "had to plead with him for hours before finally convincing him to go home." Finally, the bishop described a third occasion when Walker tried to denounce him, but was "escorted out of the church."

The bishop's account was echoed by a member of the congregation, Bruce Kendrick, who described how Walker "totally lost it and interrupted Bishop Byrd during one of his services by announcing to the entire congregation that the Bishop and his wife were evil and overcome by demons." Kendrick reported that Walker was carrying a staff and "started talking crazy and trying to run the demons out of the Bishop," and how he thought that "[i]t was obvious that [Walker] was having a mental breakdown." Kendrick confirmed Hobbs's report

about how Walker became obsessed with her, and Kendrick reported other unusual things that Walker had done.

Other habeas witnesses provided information about Walker's mental state shortly before the murder. Walker's uncle, Robert Walker, reported that Walker had become "obsessed with the Bible," "kept to himself a lot," became concerned about the finances of his business, and resumed his prior practice of fasting "for 30 or 40 days at a time."[8] Walker had hired Charles McKellar a week before the murder, and McKellar explained in his habeas testimony that Walker "would act real strange during that week," that it was "real hard to have a conversation" with Walker at that time, that Walker "would start out by talking about one thing and then he would talk about something completely different," that "most of the time [he] did not really know what [Walker] was talking about," that Walker would give him directions to do something only to later

---

[8] The Warden argues that we should conclude that Robert Walker provided false testimony by claiming in the habeas proceedings that he was not interviewed pretrial "about [Walker] or [his] relationship with [Walker]," and the Warden points to a letter that Walker's original, interim counsel wrote, in which counsel said that he had contacted Robert at Walker's request and that Robert "was arranging to come to Georgia to see [Walker] about the employment of new counsel." We find this argument unpersuasive, even setting aside any concern that it is based on hearsay, because the letter does not actually contradict Robert's habeas testimony, the gist of which was that he had not previously been asked questions about Walker of the sort that he was asked in the habeas proceedings.

forget doing so, that Walker would strangely say of persons using the payphone across the street that they were "one of us," and that Walker was "under a lot of stress about his store" and "did not know if he would make it."

Willie Golphin was a jail guard during part of the time Walker was in custody before his trial.[9] Golphin reported that, although Walker seemed to be a "pretty bright guy," he showed signs of mental illness. Golphin explained how Walker would speak frequently with him, and how Walker would show signs of paranoia, complaining that he could not trust any lawyers from the area, and speaking "as if someone's out to get him." He also explained how Walker's "ideas [would] become a little scattered, a little in disarray" and would sometimes be "veering away from reality" and "not holding any substance." He reported that Walker would "act strange, tilt his head, look off to the side and only look at [him] out of the corner of his eye" while speaking to him, that Walker would speak "about things that were just not conceivable or rational," and that Walker would continue to speak as though nothing had changed, even after he had announced that he was leaving and was walking away. He believed that Walker often was hallucinating. He recommended that Walker speak to a

---

[9] Walker named Golphin as a person of interest during his conversations with counsel.

mental health counselor, which Walker apparently never did. Golphin, who had a background but no degree in mental health, thought that Walker suffered from a "schizoaffective personality."

When Dr. Meck finally rendered an opinion in the habeas proceedings, which he based on the foregoing evidence presented in the habeas court, he opined that Walker likely had not been competent to stand trial. Dr. Meck testified as follows:

> "[Walker] was essentially free from any mental illness until about 18 or 19, when he began to get heavily involved in church doctrine and fasting and . . . from then on he exhibit[ed] significant pathology suggestive of mental illness. The diagnosis that I would use at this point in time is what's called a psychotic disorder NOS [not otherwise specified]. Now, that's a ten dollar word for saying something's wrong with this guy, okay, but he won't talk to us so we can't pinpoint exactly what's wrong. So, we begin to look at his behavior then from that period of time and we see a lot of evidence of delusional kinds of behavior.[10]

He added that Walker's delusions were not initially identified by some of his family and associates, because they were expressed in religious ways that were not immediately identifiable as being based on delusions. But he also noted that,

---

[10] The Warden complains that the "not otherwise specified" aspect of the diagnosis renders the opinion of Dr. Meck useless. But Dr. Meck clearly testified that it was only the specific kind of delusional thought process that could not be determined, not whether Walker, in fact, had delusional thoughts that bore upon his competence to be tried.

over time — and as Walker's behavior became more and more bizarre — his behavior began to be recognizably abnormal, pointing to the incident in which Walker attempted to take over his bishop's church and publicly decried the bishop's wife as "the Witch of Hindu" as an example. Dr. Meck testified that a delusion is a "fixed belief pattern" that is "contra to reality." He explained that "[u]sually, your first delusions are delusions of grandeur," and he explained further that the testimony of the lay witnesses confirmed that Walker's delusional disorder appeared to progress in this way. Indeed, he noted that Walker first showed symptoms when he began to view himself as religiously "at a different level" than those around him and started to hatch unrealistic plans about instantly founding a massive ministry that he would lead. Dr. Meck then opined that Walker's mental illness escalated, particularly as his extreme fasting practices exacerbated his psychological problems, and as his closest friends moved away to begin college and careers. Dr. Meck explained how "illusions" are "altered sensations" that lead one to conclude that real persons and objects are something other than what they really are, and his testimony indicated that Walker was having such experiences. He further explained that a "hallucination" is an experience of actually seeing things that are not actually there at all, but he

30

testified that he could not conclude whether Walker had hallucinations because Walker was unwilling to communicate with him. He testified that Walker "is a very intelligent person," but he explained that Walker's mental condition causes him to have "a loss of touch with reality." He explained as well that Walker's writings "show a significant thought disorder," which is one of the components of a psychotic disorder.[11] In addition, Dr. Meck said that Walker's thought disorder likely reinforces his delusions. Dr. Meck testified that Walker's belief that there is nothing wrong with him, and that he "doesn't need any assistance" — which Dr. Meck referred to as "anosognosia" — is consistent with a diagnosis of psychosis, especially within the context of Walker's pattern of strange writings and behavior. Dr. Meck admitted that there appeared to be "a period of remission of a lot of this," but he noted that Walker's mental

---

[11] The Warden argues that Dr. Meck should not have been permitted to testify about these writings because he would not have been permitted to testify in a competency trial about communications between Walker and his counsel. Without deciding the merit of this argument, we hold that the Warden waived it because he did not raise it in the habeas court when Dr. Meck testified. Furthermore, the fact that many of the writings on which Dr. Meck relied at the habeas hearing were written after trial does not change our assessment of his opinions, because there was testimony that these writings were comparable to Walker's earlier writings. Finally, despite the fact that not everything strange in Walker's statements and writings can be proven to have been a product of his delusional thinking, Dr. Meck acknowledged as much, and he nevertheless opined that the whole of the materials on which he based his opinions supported them. In any event, this goes to the weight and credibility of his testimony, something committed to the discretion of the habeas court.

31

condition worsened again when he fell under financial stress, resumed his extreme fasting practices, and began to disengage from his local relatives. Dr. Meck acknowledged too that he was unable to determine, without conducting a clinical interview with Walker, how Walker's mental condition might have related directly to his crimes.[12]

But Dr. Meck was clear that Walker's mental condition affected his ability to participate meaningfully in his defense. Regarding Walker's unrealistic certainty that he would be found not guilty without mounting any defense, Dr. Meck testified: "It's very significant in that he's not in touch with reality, he's distorted what is going on at this point in time." Regarding Walker's refusal to assist his trial counsel, he testified: "I think it's based more on pathology suggestive of his underlying mental illness. I think that he's the most atypical person that I've ever seen in a case like this. . . ." Although referring to Walker's habeas proceedings, he nevertheless connected the following assessment to Walker's long-term mental illness: "I don't think he has any idea of the consequences of what is going on in these court proceedings." He explained that

---

[12] Regarding the possibility that Walker had a "psychotic break" at the time of his crimes, Dr. Meck said, "I can't rule it in and can't rule it out."

he found Golphin's pretrial assessment of Walker's mental condition to be largely accurate. Dr. Meck also explained that Walker's willingness to cooperate with Murray, his first lawyer, was consistent with Walker's mental illness, insofar as it was based on Walker's "biblical sense" that Murray "was his equal." Dr. Meck added, however, that even Murray "had difficulty focusing [Walker] on the fact that [he had] been arrested for [the murder]" and that Walker's interactions with Murray demonstrated "signs of a thought disorder as well as delusional disorder." Dr. Meck testified that he "never would" base a diagnosis on only one source, but he made clear that Walker's symptoms were confirmed by a variety of independent sources, and his diagnosis and opinions were being rendered within the bounds of approved professional standards. He acknowledged that a person might have a thought disorder, have some other mental illness, or simply be uncooperative with counsel and yet be competent to stand trial. He did not believe, however, that Walker's case fit into any of those categories. He testified that he believed that Walker was "fine with the factual understanding of the legal proceedings" against him at trial, opining:

> I think he definitely knows court procedures. I think he definitely was aware of the role of a judge, a jury, a defendant, although I question whether or not he thought he was the defendant

33

sometimes. But I think the procedures, motions, and stuff like that, I think that, you know, if we were to ask him those kinds of issues I think he'd be fine with it.[13]

But he explained that Walker has "significant problems" with "reasoning and appreciational or rational thinking." In his view, Walker failed to understand the need for his counsel to obtain a psychological evaluation of him or to prepare mitigating evidence because he was obsessed with "his ministry and the religious kinds of things," and he failed to appreciate what was actually happening to him as he awaited trial for his crimes. Dr. Meck explained that he would have recommended that Golphin attempt to administer some tests to Walker and that Walker be sent to a mental health facility for observation. One can only speculate about what might have been the results of such specific additional endeavors in this case, but at a minimum, Dr. Meck's own opinions could have been presented to a jury at a competency trial. His final opinion was that, based solely on the information available at the time of Walker's trial, Walker was not competent to stand trial because he was unable to understand

---

[13] This assessment of Walker's ability to comprehend at least some of the mechanics of the criminal process is consistent with his interactions with the trial court, as shown in the record of the trial.

the legal options available to him and was unable to meaningfully assist his attorneys.[14]

The Warden argues that we should not consider the opinion of Dr. Meck because, the Warden says, his opinion testimony would have been inadmissible in any competence trial to the extent that Walker refused to submit to an examination by an expert for the State, as the record indicates Walker almost certainly would have so refused. As the Warden notes, we have held before that a trial court properly may disallow expert mental health testimony offered by the accused and derived from an examination of the accused when the accused refuses to permit an examination by an expert for the prosecution. See Jenkins v. State, 265 Ga. 539, 540-541 (3) (458 SE2d 477) (1995). But the disallowance of such testimony seems mostly justified by notions of a level playing field, that is, the idea that the accused ought not be permitted to offer expert testimony based upon his own (possibly self-serving) statements and, at the same time, deny the State a fair opportunity to challenge those statements. See id. at 541 (3). See also Kansas v. Cheever, ___ U. S. ___ (134 SCt 596, 187 LE2d 519)

_____

[14] In the habeas proceedings, the Warden offered no expert mental health testimony at all.

(2013) (holding that the "prosecution may present psychiatric evidence" based on the defendant's statements to the prosecution expert without violating the Fifth Amendment "where a defense expert *who has examined the defendant* testifies," and explaining that "[a]ny other rule would undermine the adversarial process, allowing a defendant to provide the jury, through an expert operating as proxy, with a one-sided and potentially inaccurate view of his mental state at the time of the alleged crime" (emphasis supplied)). Here, Walker refused to submit to an examination by *any* expert, and the opinions of Dr. Meck were not based upon any statements that Walker gave in an examination. To the contrary, Dr. Meck based his opinions principally on the observations of Walker by third parties, to whom the State had access. Without deciding whether the opinions of Dr. Meck would have been admissible in the guilt-innocence or sentencing phases of trial, we hold that they would not have been inadmissible in a competence trial simply because Walker would not submit to an examination. After all, in the context of a competence trial, there is a real danger that the incompetence of the accused may lead him to refuse to cooperate with any expert, and the very issue to be tried is whether he is mentally capable of

adequately understanding the proceedings and meaningfully assisting counsel in his own defense.

In the light of the factual findings of the habeas court — to which we must defer, insofar as they have some evidentiary support — we cannot say that the habeas court erred when it determined that Walker was denied the effective assistance of counsel with respect to an investigation and evaluation of his competence. Counsel actually believed that Walker required a professional mental health evaluation, and they had good reasons for so believing. A reasonable lawyer in these circumstances would have pursued a professional mental health evaluation, as counsel in this case made some effort to do. But a reasonable lawyer would not have abandoned the pursuit so quickly, just because Walker was opposed to the development of evidence of his mental health. After all, although an accused ordinarily is the "master of his own defense," a client that appears incompetent presents no ordinary case. See Perkins, 288 Ga. at 814 (II) (A) (discussing tension between client's control of his own defense and counsel's duty to thoroughly investigate background of his client in death penalty case). See also Pate, 383 U. S. at 385 (II) (holding that trial court itself must make inquiry into competence sua sponte if competence

appears to be in question); <u>Almond v. State</u>, 180 Ga. App. 475, 477 (1) (349 SE2d 482) (1986) (noting that a defendant, although generally free to proceed pro se, has a special need for representation during a competency trial); Georgia Rule of Professional Conduct 1.14 (a) ("When a client's ability to make adequately considered decisions in connection with a representation is diminished, whether because of minority, mental impairment or for some other reason, the lawyer shall, as far as reasonably possible, maintain a normal client-lawyer relationship with the client."); Georgia Rule of Professional Conduct 1.2, comment 4 ("In a case in which the client appears to be suffering from diminished capacity, the lawyer's duty to abide by the client's decisions is to be guided by reference to Rule 1.14.").

Moreover, counsel were not deterred from investigating the mental health of their client just because Walker did not wish for them to do so. Instead, it was his specific refusal to submit to an examination that deterred them, the record shows. When Walker refused to submit to an examination, counsel appear to have assumed that the absence of an examination meant that a useful evaluation would be impossible. But counsel were not themselves mental health professionals, and it was not reasonable for them to assume as much. Compare

38

Head v. Carr, 273 Ga. 613, 631 (4) (C) (7) (544 SE2d 409) (2001) (holding, where counsel did meaningfully consult with their expert but did not receive any request from the expert for additional materials, that "a reasonable lawyer is not expected to have a background in psychiatry or neurology"). Had they consulted with Dr. Meck, as a reasonable lawyer would have done, they would have learned that he could evaluate Walker by alternative means.

In light of such a consultation, a reasonable lawyer would have given Dr. Meck the materials and information that counsel did have, and a reasonable lawyer would have gone to greater lengths to secure additional evidence by which Dr. Meck might evaluate Walker. Sufficient materials and information from which Dr. Meck could have formed an opinion about Walker's competence were readily available to counsel at and before his trial, and a reasonable lawyer would have supplied those available materials and information. And from such materials and information, Dr. Meck would have drawn the conclusion that Walker was not competent to stand trial, an opinion to which he could have testified at a competency trial. At such a trial, the question for the jury would have been whether Walker was "capable of understanding the nature and object of the proceedings, whether he comprehend[ed] his own condition in reference

39

to such proceeding[s,] and whether he [wa]s capable of rendering his counsel assistance in providing a proper defense." Sims, 279 Ga. at 390 (1) (citation omitted). Walker would have borne the burden at such a trial to show his incompetence by a preponderance of the evidence. Id. If Dr. Meck had so testified at a competence trial, we can find no error in the conclusion of the habeas court that a reasonable probability exists that Walker would have been found incompetent to stand trial, especially in the absence of any expert testimony contradicting that of Dr. Meck. Accordingly, Walker has carried his heavy burden to show that he was denied the effective assistance of counsel with respect to competence, and by carrying that burden, he has shown sufficient cause and prejudice to overcome the procedural default of his claim that he was tried while he was incompetent.

B. The Merits

We turn now, therefore, to the merits of the claim that Walker was tried while he was incompetent. As we noted earlier, Dr. Meck testified in the habeas proceedings that Walker likely was incompetent at the time of his trial. And as we also noted, this testimony is not disputed by any expert testimony offered by the Warden. The Warden does note that, at trial, the trial court offered its own

40

opinion that Walker seemed to adequately understand the proceedings. That opinion is worth something — after all, the experienced trial judge had an extended opportunity to observe Walker in the pretrial proceedings and at trial — but we cannot say that the habeas court had to give it more weight than the opinion of Dr. Meck. The habeas court was in the best position to assess the credibility of Dr. Meck, and it obviously found him quite credible. Given the standard of review, we cannot say that the habeas court clearly erred when it found that Walker was incompetent at the time of his trial. For this reason, we must affirm the grant of the writ and the vacating of Walker's convictions and sentences. The State may, of course, retry Walker, but only if he is competent at the time of retrial.

## III. *The Remaining Issues*

In light of Division II, we need not reach the other grounds upon which the habeas court granted the writ. Likewise, we also need not decide the cross-appeal, which is rendered moot by our decision in Division II. Accordingly, we affirm the judgment of the habeas court in Case No. S13A1472, and we dismiss the appeal in Case No. S13X1473 as moot.

41

Judgment affirmed in Case No. S13A1472. Appeal dismissed as moot in Case No. S13X1473. All the Justices concur.

Decided March 28, 2014.

Habeas corpus. Butts Superior Court. Before Judge Conner from Gwinnett Circuit.

Samuel S. Olens, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Sabrina D. Graham, Dana E. Weinberger, Assistant Attorneys General, for appellant.

Brian Kammer, for appellee.